2013 VT 71

## State of Vermont v. Corrina Sullivan

[80 A.3d 67]

No. 12-134

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed August 23, 2013

**David J. Cahill**, Windsor County Deputy State's Attorney, White River Junction, for Plaintiff-Appellee.

**Matthew F. Valerio**, Defender General, *Rebecca Turner*, Appellate Defender, and *Erick Tobias*, Law Clerk (On the Brief), Montpelier, and *Daniel S. Stevens* of *Marsicovetere Law Group, PC*, White River Junction, for Defendant-Appellant.

¶ 1. **Robinson, J.** Defendant Corrina Sullivan seeks reversal of her conviction for driving under the influence of alcohol (DUI) on the ground that the trial court erred in denying her motion to suppress various statements and evidence obtained during or as a result of an encounter between her and police officers in her apartment. We affirm.

¶ 2. The facts as found by the trial court and supported by sufficient evidence are as follows. On a cold January night, a Department of Corrections (DOC) officer was traveling in his vehicle down Christian Street in the Town of Hartford when he encountered defendant walking up the road about 100 feet from a motor vehicle stuck in a snow bank. The back half of the vehicle was encroaching on the traveled roadway, and both the rear reverse lights and dash lights were on. The DOC officer offered defendant a ride home.

¶ 3. During the brief trip, defendant identified herself and told the DOC officer that she had driven off the road because she was upset by a fight with her boyfriend. The DOC officer dropped her off at an apartment less than a mile away and reported the vehicle to the Hartford Police Department.

¶ 4. Officer Muldoon responded, arriving at the vehicle within six to ten minutes. He found documents in the vehicle listing defendant's name and address. The DOC officer, who had returned to the scene, told Officer Muldoon that he had driven defendant home.

¶ 5. Officer Muldoon drove to defendant's apartment and knocked on the door. Defendant's grandmother answered. After Officer Muldoon asked to speak with defendant, grandmother invited him in and called for defendant to come out of her room.

¶ 6. Defendant responded evasively to the first questions Officer Muldoon asked her about what had happened that night, avoiding eye contact and leaning against a wall. Her speech was neither clear nor articulate. From eight-to-ten feet away from defendant, Officer Muldoon detected a slight odor of alcohol. He explained to her that he was conducting an investigation and they could proceed in "one of two ways."

¶ 7. Officer Muldoon asked if defendant had anything to drink that night. Defendant looked down and did not respond, and Officer Muldoon said he would take her response as a "yes." Officer Muldoon then asked defendant to step out of the apartment to perform standard field sobriety tests.

¶ 8. At that point the grandmother began asking Officer Muldoon questions about DUI processing. He told the grandmother if defendant refused the evidentiary breath test she would lose her license for refusing. The grandmother then talked with defendant about the situation. In the course of that conversation, defendant mentioned an eleven-year-old conviction for DUI.

¶ 9. Defendant's friend then arrived at the apartment and joined the conversation between defendant and the grandmother. Defendant, the grandmother, and the friend discussed removing the car from the snow bank. Defendant was crying and upset because she had crashed the car. The three of them continued to talk amongst themselves, occasionally engaging Officer Muldoon. Meanwhile, Officer Muldoon waited for backup to arrive before taking further steps.

¶ 10. At one point, defendant told Officer Muldoon that she would not submit to a blood test. He replied that a field sobriety and breath test would clear up any questions about a DUI. Both the grandmother and friend tried to persuade defendant to take the field sobriety tests, but she continued to refuse. Officer Muldoon attempted to clarify whether defendant was refusing to

take the tests but she said nothing in response. He asked again if she had anything to drink that night, and she replied, "not for a while."

¶ 11. At that point, Sergeant Vail from the Hartford Police Department arrived at the apartment. In response to his questioning, defendant told Sergeant Vail that she had had "probably three beers." Sergeant Vail again requested she submit to the preliminary breath test (PBT), but she refused. The officers then formally arrested defendant on suspicion of DUI and transported her to the Hartford Police Department for DUI processing. At the station, she was read her *Miranda* rights and consented to an evidentiary test. *Miranda v. Arizona*, 384 U.S. 436 (1966). The period from Officer Muldoon's arrival to defendant's formal arrest lasted about seventeen minutes.

¶ 12. The evidentiary breath test taken at the station yielded a blood-alcohol concentration of 0.246, well above the legal limit. Defendant was charged with DUI, second offense, pursuant to 23 V.S.A. § 1201(a)(2). Defendant filed a motion to suppress all evidence obtained after the Hartford Police encountered defendant at her apartment on the ground that the evidence derived from an unlawful seizure, and a motion to dismiss on the ground of the insufficient evidence that would result from suppression. In the alternative, defendant sought suppression of the statements regarding her alcohol consumption that she made prior to her formal arrest. After a hearing, the trial court denied defendant's motions in a written order.

¶ 13. The trial court rejected defendant's argument that Officer Muldoon did not have reasonable suspicion to investigate her for DUI. The court concluded that evidence of the single-car accident, defendant's leaving her car, defendant's evasive answers and suspicious demeanor when police first encountered her, and Officer Muldoon's detection of the slight odor of alcohol taken all together were sufficient to justify the officer's reasonable suspicion that defendant had committed DUI. Considering the totality of the circumstances, the trial court rejected defendant's contentions that her statements were involuntary and were the product of an unwarned custodial interrogation. The court explained that defendant was interviewed in her own home, that her grandmother and subsequently her friend were present throughout, that most of the conversation during the seventeen-minute encounter was between defendant and her grandmother and friend, rather than defendant

and police officers, and that defendant showed she was able to make her own decisions, holding firm on her refusal to take a field sobriety test despite encouragement from her grandmother, her friend, and law enforcement. Finally, concluding that there was no formal or de facto arrest at the time Officer Muldoon told defendant he was investigating a crime (relating to the car in the snow bank) and could proceed in "one of two ways," the court rejected defendant's argument that she was effectively arrested at that time without probable cause.

¶ 14. Defendant subsequently entered a conditional guilty plea pursuant to V.R.Cr.P. 11(a)(2), preserving her right to appeal all issues. On appeal, defendant raises the same arguments as she did in her motion to suppress.

¶ 15. A motion to suppress involves a mixed question of law and fact. *State v. Simoneau*, 2003 VT 83, ¶ 14, 176 Vt. 15, 833 A.2d 1280. We will not disturb a trial court's findings of fact unless they are unsupported by the evidence or are clearly erroneous. *State v. Sutphin*, 159 Vt. 9, 11, 614 A.2d 792, 793 (1992). We review questions of law de novo. *State v. Mara*, 2009 VT 96A, ¶ 6, 186 Vt. 389, 987 A.2d 939.

## I.

¶ 16. We begin with defendant's contention that Officer Muldoon seized her without reasonable suspicion. Defendant argues that Officer Muldoon seized defendant almost immediately upon his arrival at her apartment. At that time, all the officer knew was that an upset driver had slid her car off a snow-covered road into a snow bank — a commonplace winter occurrence in Vermont — and that she had left the rear and dash lights on — likely to help other drivers see the car. These facts, defendant argues, do not give rise to a reasonable suspicion to support Officer Muldoon's seizure of her.

¶ 17. ■ ■ We have long recognized that "[a] brief detention, its scope reasonably related to the justification for the stop and inquiry, is permitted in order to investigate the circumstances that provoke suspicion." *State v. Chapman*, 173 Vt. 400, 402, 800 A.2d 446, 449 (2002) (quotation omitted). We described in *State v. McGuigan* the evolving circumstances that arise in police-citizen encounters, particularly in the DUI context:

> [An investigatory] detention may begin with a consensual
> encounter between the police and a citizen . . . or with

the investigatory stop of a suspect. Under either circumstance, if the officer can point to factors indicating that a suspect has been involved in wrongdoing — [such as,] driving under the influence of alcohol — the initial encounter can escalate, with each inquiry by the officer leading to further evidence justifying further restraints on defendant's freedom until probable cause exists to arrest defendant . . . for DUI.

2008 VT 111, ¶ 8, 184 Vt. 441, 965 A.2d 511 (quotation and alterations omitted).

¶ 18. ■ An investigatory detention must be supported by reasonable suspicion of criminal activity. *State v. Bruno*, 157 Vt. 6, 11, 595 A.2d 272, 275 (1991). A reasonable suspicion requires something less than evidence sufficient to prove guilt by a preponderance of the evidence, but "must be more than an inchoate and unparticularized suspicion or hunch." *State v. Warner*, 172 Vt. 552, 554, 773 A.2d 273, 275 (2001) (mem.). Whether an officer's suspicions of criminal activity are reasonable is determined from the totality of the circumstances. *Id.* No one factor or specific combination of factors is determinative.

¶ 19. ■ In this case, we need not determine precisely when Officer Muldoon's encounter with defendant became an investigatory detention. The moment is not critical because we conclude, based on the trial court's findings, that the trial court did not err in concluding that Officer Muldoon had a sufficient basis to support his reasonable suspicion immediately following his first exchange with defendant. The basis existed before the statement that he could proceed "one of two ways," which marks the earliest arguable transition to an investigatory detention.

¶ 20. Before even arriving at defendant's home, Officer Muldoon knew that defendant had left a car in a snow bank with a portion of the car protruding into the road, with the gearshift in reverse, and the dash and reverse lights illuminated. Cf. *State v. Willette*, 142 Vt. 78, 80-81, 451 A.2d 821, 822 (1982) (permitting officers to use circumstantial evidence about condition of vehicle — abandoned car facing wrong direction on highway with flat tire and without emergency lights flashing — to support reasonable suspicion of impairment).

¶ 21. Immediately upon meeting defendant, Officer Muldoon asked her about what was going on, and defendant replied

"nothing." The trial court reasonably concluded that, under the circumstances, Officer Muldoon was correct in treating this answer as evasive. See *People v. Hibbert*, 813 N.Y.S.2d 443, 444 (App. Div. 2006) (factoring defendant's evasive and untruthful responses to police officers' inquiries as supporting reasonable suspicion); *United States v. Smith*, 594 F.3d 530, 541 (6th Cir. 2010) (considering evasive, nonresponsive, and vague answers to officer's questioning were additional bases supporting reasonable suspicion that defendant had committed, was committing, or was about to commit crime).

¶ 22. ■ In addition, Officer Muldoon detected a slight odor of alcohol and observed other signs of impairment. We have repeatedly held that the smell of alcohol emanating from a person is a factor that can support an officer's reasonable suspicion in the context of a totality-of-the-circumstances assessment. See *State v. Young*, 2010 VT 97, ¶ 21, 189 Vt. 37, 12 A.3d 510 (strong odor of alcohol and slurred speech); *State v. Santimore*, 2009 VT 104, ¶ 8, 186 Vt. 638, 987 A.2d 332 (mem.) (odor of alcohol and watery and bloodshot eyes); *Mara*, 2009 VT 96A, ¶ 12 (odor of alcohol, admission to drinking, and watery and bloodshot eyes). When Officer Muldoon initially spoke to defendant, she was leaning against a wall. Cf. *Bruno v. Iowa Dep't of Transp.*, 603 N.W.2d 596, 599 (Iowa 1999) (difficulty pronouncing numbers, exhibiting unsteady balance, leaning against the squad car for support, smelling of alcohol and fact of minor accident sufficient to support request for evidentiary test). Defendant's speech was neither clear nor articulate. See *State v. Freeman*, 2004 VT 56, ¶¶ 8-9, 177 Vt. 478, 857 A.2d 295 (mem.) (affirming reasonable suspicion determination based on odor of alcohol, watery and bloodshot eyes, and speech that was very slightly slurred). We need not decide whether any of these factors alone could support reasonable suspicion; taken together, this evidence supports the trial court's finding of reasonable suspicion sufficient to warrant an investigatory detention of defendant.

## II.

¶ 23. We next turn to defendant's argument that without even a reasonable suspicion of criminal activity, let alone the necessary probable cause, the officers placed defendant under de facto arrest by the time the police officer told her that if she refused to

provide a preliminary breath test or perform field sobriety tests, she would be arrested. She argues that the following actions communicated to her that she was not free to end the encounter: the "one-of-two-ways" statement, with its implicit threat of arrest; the accusations of criminal activity; the officers' pointed and repeated questions, language and tone; and their request to speak with defendant outside.

¶ 24. ■ There is no bright-line rule differentiating an investigatory detention from a de facto arrest. *Chapman*, 173 Vt. at 403, 800 A.2d at 449. An investigatory detention "employs the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 402-03, 800 A.2d at 449 (quotation omitted). When such a seizure becomes too intrusive to be considered an investigatory detention, the encounter escalates into the functional equivalent of a formal arrest, or de facto arrest, and must be supported by probable cause. *Id.* at 403, 800 A.2d at 449. Whether an encounter is classified as an investigatory detention or a de facto arrest "depends on the reasonableness of the . . . intrusion under the totality of the circumstances." *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991).

¶ 25. ■ Factors we have considered in determining whether the degree of restraint is too intrusive to be considered an investigatory detention include:

> "the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, . . . the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect"

*Chapman*, 173 Vt. at 403, 800 A.2d at 449 (alterations omitted) (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)). The inquiry balances the degree of intrusion — in length and scope — against the justification. *State v. Ford*, 2007 VT 107, ¶ 6, 182 Vt. 421, 940 A.2d 687.

¶ 26. ■ ■ On the record before us, we conclude that the trial court did not err in concluding that the seizure did not escalate to a de facto arrest prior to defendant's formal arrest, and that the nature and scope of the officers' intrusion did not exceed the justification for the investigative detention. Officer Muldoon nei-

ther used force nor physically restrained defendant prior to the actual arrest. In fact, defendant remained in the house and freely roamed around despite Officer Muldoon's requests to move the investigation outside and for defendant to submit to a PBT. See *State v. Pontbriand*, 2005 VT 20, ¶ 16, 178 Vt. 120, 878 A.2d 227 (for purposes of determining whether suspect was in custody, " 'police-dominated atmosphere' results when law enforcement of- ficers take action to fetter the suspect's freedom of movement during the interrogation"); cf. *Chapman*, 173 Vt. at 404-07, 800 A.2d at 450-52 (fact that officers drew weapons in absence of any evidence of danger supported conclusion that investigative detention turned into a de facto arrest). Additionally, the majority of the encounter occurred in the presence of a single officer, and the number of officers never exceeded two. See *Pontbriand*, 2005 VT 20, ¶ 16 (finding defendant was not in custody despite being questioned in hospital bed by two officers). Defendant was not alone with the officers; at all times she had at least as many friends or family members by her side as the number of officers in the room. In the absence of the use of force or an overwhelming police presence, and in light of defendant's presence in her home with family and friends and defendant's ability to move without restriction, we conclude that defendant was not placed under de facto arrest at any time prior to the actual arrest.[*]

## III.

¶ 27. Next, defendant argues that the trial court erred in refusing to suppress her statements because Officer Muldoon did not advise her of her *Miranda* rights. 384 U.S. 436. Defendant argues that she was essentially "in custody" at the time police officers asked her how much she had drunk that night, and that police accordingly should have advised her of her rights. Defend-

---

[*] To the extent that the issue of whether there was probable cause to arrest at the time of the formal arrest arose during oral argument, this argument was not raised by defendant and was not briefed to this Court by either party. Although we retain the discretion to take up issues raised at oral argument, we usually do not, and we decline to do so here, particularly where defendant never raised the issue to this Court. See *TD Banknorth, N.A. v. Dep't of Taxes*, 2008 VT 120, ¶ 33, 185 Vt. 45, 967 A.2d 1148 ("We will not address arguments raised for the first time at oral argument . . . ."). But see *State v. Pitts*, 174 Vt. 21, 26, 800 A.2d 481, 485 (2002) (addressing defendant's claim, raised for the first time at oral argument, that information did not properly charge her, preventing her adequate preparation).

ant points to the "one-of-two-ways" statement, Officer Muldoon's statement that he would treat her silence in response to his question about whether she had been drinking as a "yes," his statements suggesting he believed her guilty of a crime, the fact that he never told her she was free to terminate the interview, the fact that she was in her home and accordingly could not simply exit the situation, and her lack of consent to the interrogation as factors supporting her claim that she was in custody. The trial court denied defendant's motion, concluding that she was not in custody at the time she made the statements.

¶ 28. ■ In *Miranda v. Arizona*, the U.S. Supreme Court held that police officers must advise suspects of their right to remain silent and to have an attorney present before engaging in a custodial interrogation. 384 U.S. at 444-45. However, officers are not required to provide *Miranda* warnings for suspects that are not in custody. *State v. Garbutt*, 173 Vt. 277, 282, 790 A.2d 444, 448 (2001). A suspect must be subject to "custodial interrogation" — "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" — for *Miranda* to be triggered. *Miranda*, 384 U.S. at 444. Whether police action rises to the level of a custodial interrogation requires "an objective inquiry based on the totality of circumstances." *State v. Willis*, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985).

¶ 29. ■ The central question in determining whether a suspect is in custody for purposes of delivering *Miranda* warnings "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Pontbriand*, 2005 VT 20, ¶ 11 (quotation omitted). In *State v. Muntean*, we discussed several factors identified by the U.S. Supreme Court as pertinent to this inquiry, including: (1) the location of the questioning; (2) the questioning officer's belief of the suspect's guilt, if that belief is communicated to the suspect; (3) whether the suspect came to the interview voluntarily; and (4) whether a reasonable person would have felt free to leave. 2010 VT 88, ¶ 19, 189 Vt. 50, 12 A.3d 518. In addition, we listed other relevant factors:

> [T]he extent to which the suspect was confronted with evidence of guilt; whether and to what degree the suspect's freedom of movement was restrained; whether

the police used deceptive techniques in conducting the interview; the degree to which the suspect was isolated from the outside world; the duration of the interview; whether the police officers were armed; and the number of police officers present during the interview.

*Id.* More recently, in *State v. Hieu Tran*, we emphasized that the most important factor is whether police told the defendant that he or she was free to leave. 2012 VT 104, ¶ 14, 193 Vt. 148, 71 A.3d 1201.

¶ 30. ▮ This was not an interview at a police station, nor even in a police cruiser. See *id.* (considering fact that two police officers questioned defendant for an hour in closed police car supported conclusion that questioning amounted to custodial interrogation in concert with other factors); *Muntean*, 2010 VT 88, ¶ 24 (concluding questioning amounted to custodial interrogation where questioning occurred in secure section of police barracks). Instead, the interview took place in defendant's own home, under circumstances that did not resemble the sort of "police-dominated atmosphere" that typically supports a finding of custody.

¶ 31. Police did not restrict defendant's movements within her home, and, when defendant declined the officer's invitation to step outside, he did not force her to go. Cf. *State v. Fleurie*, 2008 VT 118, ¶¶ 4-5, 8, 185 Vt. 29, 968 A.2d 326 (noting trial court's conclusion that police interrogation of defendant in his home became custodial where, among other things, police did not allow defendant to move around within his home or to get cigarette).

¶ 32. The officers made no effort to isolate defendant from others; as noted above, the number of friends and family members in defendant's apartment outnumbered the number of police officers. See, e.g., *Hieu Tran*, 2012 VT 104, ¶ 19 (finding custody where police officers questioned defendant in police cruiser outside of his home, thereby separating him from familiar setting of his home and family); *Pontbriand*, 2005 VT 20, ¶ 16 (concluding defendant was not in custody when questioned by police in his hospital bed where door was open and medical personnel entered and exited freely throughout interview).

¶ 33. As to whether defendant was subject to interrogation, the "questioning" itself was quite limited. During much of the seventeen minute encounter, defendant talked with her grandmother and friend, Officer Muldoon waited for assistance, and the police

officers attempted to cajole defendant to submit to field sobriety tests or an evidentiary test. The actual "questioning" was limited to a handful of questions over the course of that period about when and how much defendant had drunk. There is no evidence that the officers used deceptive techniques or harangued defendant with these questions.

¶ 34. The officers did tell defendant their reasons for suspecting that she had been driving under the influence, but they did not repeatedly confront her with evidence of her guilt in a way that would suggest she was not free to leave. Cf. *Hieu Tran*, 2012 VT 104, ¶¶ 15-16 (determining officers' questioning of defendant over course of hour, confronting him with evidence of his guilt, created custodial atmosphere).

¶ 35. Although police did not specifically advise defendant that she was free to terminate the interview, we nevertheless conclude that considering the totality of the circumstances defendant was not in custody when she made the statements she seeks to suppress, and that the trial court did not err in denying defendant's motion to suppress based on a failure to provide *Miranda* warnings.

IV.

¶ 36. Finally, defendant claims that her incriminating statements about drinking were not voluntary and their admission would violate Chapter I, Article 10 of the Vermont Constitution. She argues that Officer Muldoon crossed the line of illegal coercion early in the questioning when he said that he interpreted her silence in response to a question as a "yes." In addition to highlighting her emotionally fragile state at the time as a result of a fight with her boyfriend and her car accident, defendant points to the same array of factors that underlie her other arguments — the "one-of-two-ways" comment, the fact that police did not inform her that she was free to terminate the encounter, the allegedly custodial context, the "I'll take that as a yes" statement, and the absence of *Miranda* warnings, to support her claim.

¶ 37. We have held that Article 10 prohibits the taking and using of involuntary statements. *State v. Caron*, 155 Vt. 492, 504, 586 A.2d 1127, 1134 (1990). When a defendant challenges the admissibility of a statement under this provision, the prosecution

must prove by a preponderance of the evidence that the statements were voluntary, that is, that they were "the product of a rational intellect and the unfettered exercise of free will." *Id.* at 505, 586 A.2d at 1134 (quotation omitted). Accordingly, they may not be induced by "threats, improper influence, or physical or psychological pressure." *Id.* (quotation omitted). A confession or inculpatory statement is involuntary "if coercive governmental conduct played a significant role in inducing the statement." *Pontbriand*, 2005 VT 20, ¶ 21. Officers may use some psychological tactics in eliciting statements from a suspect; however, the ultimate inquiry into voluntariness is "whether, under the totality of the circumstances . . . , the suspect's will was overborne by the police." *Id.* ¶ 22.

¶ 38. We have previously suggested that the voluntariness of a statement for the purposes of the Vermont Constitution is a question of fact, that the trial court is the primary judge of voluntariness, and that we will affirm as long as the trial court's findings are supported by substantial credible evidence and are not clearly erroneous. *Caron*, 155 Vt. at 505, 586 A.2d at 1134-35. On the other hand, more recently, in a related context, this Court held that a trial court's conclusion concerning the voluntariness of consent to search for purposes of a Fourth Amendment analysis is subject to de novo review on appeal, with deference to the trial court's underlying findings of fact, but not its ultimate determination regarding whether consent was voluntary. *State v. Weisler*, 2011 VT 96, ¶ 26, 190 Vt. 344, 35 A.3d 970. In discussing the standard of review concerning the voluntariness *of a consent to search*, this Court noted that the standard of review governing the voluntariness *of confessions* under the U.S. Constitution is generally de novo. *Id.* ¶ 12.

¶ 39. We need not decide today whether a finding of "voluntariness" for the purposes of Article 10 is subject to the deferential review ordinarily afforded to trial courts' factual findings, or whether it represents a legal conclusion subject to de novo review. Under either approach, we affirm.

¶ 40. ▇ Under a deferential standard of review of an essentially factual determination, we conclude that the evidence before the trial court was sufficient to support its finding. The trial court here concluded that the events in the apartment demonstrated that defendant was making her own decisions about whether to

take the breath test and field sobriety tests regardless of any statements the officer made or any pressure imposed upon her by her grandmother and friend, and that her will was not overborne. Defendant's freedom to move around was not restricted, she was in her own home surrounded by her own intimates, and she demonstrated by her persistent refusal to take either a field sobriety test or an evidentiary test that she was fully capable of holding firm against perceived pressure from the officers.

¶ 41. In arguing that her consent was involuntary, defendant focuses in particular on two separate comments made by police during the encounter — Officer Muldoon's "one-of-two-ways" statement and his statement that he was taking her silence as an admission to drinking. We do not endorse either statement, but, in the context of this case, they were not so coercive as to overwhelm the substantial evidence supporting the trial court's conclusion. Moreover, defendant did not make the statements about her alcohol consumption in response to either of these remarks. She made the main admission she seeks to suppress, that she has consumed "probably three beers," well after both of these comments in response to a question from a different officer, and after reaffirming her refusal to undergo field sobriety testing or an evidentiary test. The trial court's conclusion as to voluntariness was supported by sufficient evidence.

¶ 42. By the same token, reviewing under a de novo standard whether the circumstances support the legal conclusion that defendant's statements were voluntary, we likewise affirm. Considering the totality of the circumstances, as reflected in the trial court's well-supported factual findings, we conclude that "coercive governmental conduct [did not] play[ ] a significant role in inducing the statement." *Pontbriand*, 2005 VT 20, ¶ 21.

*Affirmed.*