STATE OF VERMONT

| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| | Docket No. 111-8-13 Vtec |

| | |
|---|---|
| D & D Properties, LLC, et al., Conditional Use Application Appeal | DECISION ON THE MERITS |

D & D Properties, LLC; Daniel Carswell and Daniel Larose ("Applicants") propose to build and operate a propane storage and distribution facility on property located on Orchard Street, near its intersection with Vermont Route 105, in the Village of Enosburgh, Vermont. Applicants applied for conditional use approval for the facility and were denied by the Village of Enosburgh Falls Development Review Board ("DRB"). Applicants appealed that determination to this Court.

The Court conducted its initial scheduling conference on August 4, 2014. During that conference, the Court directed the parties to engage a mediator to assist in attempting to resolve the outstanding legal issues of this appeal. When the parties' efforts at a mediated resolution did not prove successful, this matter was initially set for a merits hearing on April 16, 2015. At Applicant's request, that merits hearing was continued. Due to then-existing staffing constraints at the Court, the merits hearing was rescheduled for July 9, 2015. At trial, Applicants were represented by Joseph F. Cahill, Jr., Esq. and the Village was represented by Jesse D. Bugbee, Esq.

The hearing was completed in one day. The Court granted the parties' request for permission to file post-trial proposed findings of fact and conclusions of law. When the parties' filings were completed, this matter came under advisement on September 9, 2015. Because of other commitments and writing assignments, the Court delayed its consideration of this matter for a considerable time, a delay which the Court regrets and for which the undersigned offers the parties and their attorneys his deep apology.

The Court conducted a site visit with the parties prior to the start of the trial. The site visit provided helpful context for the evidence that was presented at trial, but was not itself received as evidence. Based upon the evidence admitted at trial, the Court renders the following

-1-

Findings of Fact, Conclusions of Law, and the Judgment Order that accompanies this Merits Decision.

## Findings of Fact

1.      D & D Properties, LLC ("D&D") is a lawfully organized Vermont limited liability company.

2.      Applicants Daniel Carswell and Daniel Larose are the only members of D&D.

3.      The July 16, 2014 Enosburgh Falls Village Land Use and Development Regulations ("Regulations") apply to the pending application.[1] A copy of the Regulations was admitted at trial as Exhibit 1.

4.      D & D owns a 1.5± acre, triangle-shaped parcel at 679 Orchard Street in the Village ("Project Site"). The Project Site is on the eastern side of Orchard Street. The southern boundary of the Project Site is adjacent to or runs parallel to property of the Central Vermont Railway Co.; the Railway property now hosts the Missisquoi Valley Rail Trail. A copy of the survey plat for the subject property was admitted at trial as Exhibit 3.

5.      The Project Site is located in the Commercial Zoning District ("CM District"), as identified on the Village of Enosburgh Falls Zoning Map, a copy of which was admitted at trial as Exhibit 15.

6.      By application dated April 2, 2013, Applicants requested conditional use approval for their proposal to construct and operate a propane storage and distribution facility ("the Project") on the Project Site that would be used to receive bulk propane deliveries, store the delivered propane in two 30,000-gallon above-ground storage tanks, and then dispense the stored propane into "bobtail" delivery trucks for delivery to commercial and retail customers by a separate entity—Blouin Bros. Oil ("Blouin Bros.").

7.      Blouin Bros. is a subsidiary of D & D Oil, Inc. D & D Oil is a lawfully organized Vermont corporation wholly owned by Applicants Daniel Carswell and Daniel Larose. Blouin Bros. is in the business of distributing home heating oil and propane gas to customers throughout Franklin County.

---

[1] The Regulations in effect at the time of Applicants' application were amended on June 23, 2009. The Regulations submitted by the parties in this case are the July 16, 2014 Regulations. We are advised that the 2014 amended Regulations did not change the provisions that govern the pending application.

8.    Applicants' proposal for siting the propane storage tanks is depicted on a hand-sketched site plan attached to their application.  Copies of the application and site plan were admitted at trial as Exhibit 4.

9.    As shown on Applicants' site plan, the Project Site currently has an unoccupied home and an on-site septic system, including a leach field.  An existing driveway enters the Project Site from a curb cut on Orchard Street.

10.    Applicants plan to create a new curb cut at the junction of Orchard Street and Vermont Route 105 to serve as the access point to the Project Site.  Both the independent vendor trucks delivering the bulk propane to the Project and the Blouin Bros. bobtail trucks that arrive at the site to receive propane for delivery will use the new driveway to access the Project Site.

11.    As proposed, the two 30,000-gallon tanks will be secured to a pad above ground, and will sit horizontally on the site.  Alternatively, Applicants suggested that the site could be excavated and the tanks could be installed below ground, although burying the tanks will restrict the ability to inspect them.  Applicants prefer to install the tanks above ground.

12.    Applicants propose to install a security fence around the Project, with a locked gate to serve as access to the storage tanks.

13.    The Project will not be regularly manned.  Rather, Blouin Bros. truck drivers will fill the tanks on their own bobtail trucks.  It was not made clear at trial whether employees of the vendor or of Applicants will administer deliveries to the Project.

14.    Applicants suggested at trial that they have delayed commissioning more detailed precautionary safety plans for the Project due to the expense of such plans and the need for additional approvals.  Applicants represent that they would not commence construction of the new site without first securing all federal and state permits necessary for operation of this bulk storage site, and will adhere to all applicable federal, state, and national association guidelines for bulk storage and distribution propane sites.

15.    Applicants currently store propane in bulk at their business location in the center of the Village, not far from the Project site.  A movable tractor-trailer with a large propane tank is usually parked on that property; its location is noted on a Google Maps screen shot, admitted at trial as Exhibit 13.  A similar process to that proposed for the Project is already used at this existing site:

Blouin Bros. delivery truck drivers retrieve liquid propane from the tractor-trailer tank and then deliver propane gas to residential and commercial customers.

16.     Applicants have not experienced any accidents or violations of federal and state regulations at the current site since they began operation.  They wish to relocate their propane storage and distribution operation to the new site because the current site is small and cramped with the existing business offices and facilities for storing other fuels.

17.     There will be little to no new traffic generated by the Project.  Applicants' existing facility is not far from the Project Site, and bulk propane and bobtail delivery trucks already frequently pass by the Project Site.  The rate of delivery is expected to remain about the same.

18.     Bulk propane deliveries to the Project will be in liquid form.  When liquid propane is released from pressure it converts to a gas, which can easily ignite and cause explosions.

19.     When released from pressure, the converted propane gas is heavier than air and therefore tends to travel or settle nearest to the ground and to seek the lowest nearby ground elevation.  This characteristic has caused released propane gas to travel from its release point along the contours of the ground, including under a winter snow pack.  When the released gas is unrestricted and efforts to contain are unsuccessful, the released gas may travel across property boundary lines, thereby creating risks of explosions on adjoining properties.

20.     Released propane gas is so highly explosive that it only needs exposure to a spark source, such as an active car ignition system or heating furnace, to cause the released propane to ignite and explode.

21.     In its natural state, propane gas is odorless.  Because of the risk of explosion, suppliers add an odor element so that released propane may be detected by smell.  Prior to delivery to the Project, the bulk liquid propane will have already had this odor element added to it.

22.     Few details were provided at trial of external safety and prevention measures that Applicants will employ at the Project Site. At trial, the Town offered examples of some possible safety and prevention measures that Applicants could employ; such measures include regular staffing of the site, fire-detection and suppression systems, and alarms.

23.     Applicants provided credible testimony at trial, through their propane expert, of the safety measures that are built into the storage tanks and the bobtail trucks that will prevent

accidental releases of propane. These measures include internal shut-off valves that stop the flow of propane in the event there is a break in external pipes or hoses that are used to transfer propane from the storage tanks.

24. Applicants' expert did admit, however, that accidents can occur despite these safety features.

25. The surrounding neighborhood hosts a variety of developments. The closest residence is located just across Vermont Route 105 from the Project Site; that residence is about 200 feet away and is lower in elevation than the Project Site.

26. Somewhat farther away from the Project Site, to the north and just off of Orchard Street, is a mobile home park with more than a dozen residences. Several other residences are located south and east of the mobile home park, farther away from the Project Site.

27. Sticks & Stuff, a building supply and lumberyard, is located across Orchard Street from the existing driveway to the Project.

28. A nearby Mobil gas station and convenience store, owned and operated by R.L. Vallee, Inc., is also located near the Project Site to the southeast, just on the other side of the Missisquoi Valley Rail Trail and above (north of) Vermont Route 105. We estimate that this gas station and convenience store is less than 300 feet from the Project Site.

29. This gas station has several underground bulk storage tanks, and each tank can store about 10,000 gallons of gasoline. Trial testimony indicated that this gas station was "un-manned," although it was unclear whether this representation meant that there were no employees on site, or that it simply was a "self-serve" gas station, with an employee attendant inside the convenience store.

### Conclusions of Law

Applicants appealed the DRB's denial of their conditional use application and filed a six-question Statement of Questions (SOQ). Applicants' SOQ presents two legal issues for this Court to resolve: first, whether the Project is entitled to conditional use approval, and, second, whether the distinction in the Regulations between gasoline stations and other facilities that distribute hazardous materials constitutes discriminatory treatment that violates equal protection and

Vermont's Common Benefits Clause.[2] We first address conditional use review and then turn to Applicants' constitutional challenges.

I.        Conditional Use Review

The controlling issue is whether the Project is an allowed use in the Commercial Zoning District ("CM District"). Table 2.1 lists the uses permitted in each zoning district, identifying each use as allowed outright, allowed but subject to conditional use review, or not allowed.[3] How a project is classified, i.e., which defined use category it falls into, will therefore determine whether it is permitted by right, permitted subject to conditional use review, or prohibited in any particular district. Section 10 of the Regulations provides definitions of many of the terms and uses listed in Table 2.1. Some uses listed in Table 2.1 are clarified and made applicable through Sections 4 and 5 of the Regulations. See Regulations § 4.5.

Relevant here are two uses listed in Table 2.1—"Storage/Distribution Facilities" and "Hazardous Materials." Table 2.1 provides that storage/distribution facilities are allowed in the CM District, subject to conditional use review, while hazardous material uses are only allowed in the Industrial (IND) District. Section 10 of the Regulations defines a "Storage/Distribution Facility" as "[a]ny building or part thereof used for the storage, wholesale and distribution of manufactured goods and materials, and not as a primary location or outlet for business for retail use." Regulations § 10.2, at 94. "Hazardous Materials" are defined as:

> Any material or combination of materials that may be explosive, flammable, toxic, acidic, corrosive, etiologic agent, caustic, pathogenic, or radioactive in either liquid, solid, or gaseous form, or when acted upon by heat or radioactivity may

---

[2] In Questions 1 and 2, Applicants also ask whether the DRB's determination on their conditional use application was "correct." Id. at 1. As this is a de novo appeal proceeding, see 10 V.S.A. § 8504(h)(1), the "correctness" of the DRB's decision has no bearing on our Decision, and thus we will not address Questions 1 and 2. See Chioffi v. Winooski Zoning Bd., 151 Vt. 9, 11 (1989). In a de novo appeal we hear the evidence anew and apply the substantive standards that were applicable before the DRB. See 10 V.S.A. § 8504(h) and V.R.E.C.P. 5(g).

[3] Table 2.1 of the Regulations provides a listing of the permitted and conditional uses allowed in each zoning district, as well as those requiring site plan approval and those uses "Not Allowed." See Regulations at 9–11. Table 2.1 denotes the "Not Allowed" uses with an "R" listed in the appropriate column. This "R" led to some confusion at trial. During the trial discussion, the parties and the Court appeared to lapse into an assumption that the "R" in Table 2.1 designated "restricted" uses, i.e., uses that are allowed subject to certain restrictions. This was an error, since the "R" is clearly identified as designating a use "Not Allowed" in a particular district. There is no basis in the Regulations for interpreting an "R" on Table 2.1 as designating a "restricted" use (i.e., a use allowed subject to restrictions). In fact, we were unable to find the term "restricted use" ever used in the Regulations and therefore decline to use it in this decision.

become hazardous. any [sic] material when present in sufficient quantity or combination which may be reasonably assumed to constitute a peril for health and safety of employees, nearby residents, emergency personnel, and others who may be exposed to them.

Regulations § 10, at 94.

Table 2.1 lists "Hazardous Materials" as a use, but it also directs readers to Section 4.5 of the Regulations, titled "Hazardous Material." Section 4.5(A)—"Applicability"—provides, "Any proposed construction, use, or change in use that by its design or nature is intended for the manufacture, processing, reprocessing, packaging, or storage of hazardous materials shall be a conditional use permitted only upon review by the Development Review Board." Therefore, when the definition of hazardous materials provided in Section 10 is read in context with Table 2.1 and Section 4.5, it is clear that a project that involves hazardous materials is not necessarily regulated as a hazardous materials use; rather, only when a project is, "by its design or nature . . . intended for the manufacture, processing, reprocessing, packaging, or storage of hazardous materials," will the project be limited to the IND District. Regulations § 4.5(A).[4]

Given the description of propane provided at trial, in either its liquid or gas form, it is beyond dispute that propane is a hazardous material. It is highly flammable and explosive, and, especially in large quantities, "may be reasonably assumed to constitute a peril" for the health and safety of those nearby. See Regulations § 10, at 94. Applicants argue that because the propane will be stored according to federal and state safety regulations, it will not pose a peril to human health, and thus is not a hazardous material. We disagree.

The fact that there are federal and state guidelines for propane storage cuts against Applicants' assertion. The need for both state and federal safety guidelines confirms that large quantities of propane are hazardous, hence the need for additional safety standards.

---

[4] In pre-trial filings and at trial, there were some suggestions that Section 4.5 expands the DRB's authority to allow a hazardous materials use outside of the IND District so long as the proposal meets conditional use review. Such an interpretation is incorrect. Section 4.5(A) does reference conditional use review, but this reference does not overcome the limitation imposed by Table 2.1 on where a hazardous materials use is allowed. Rather, as Table 2.1 makes clear, a hazardous material use is only allowed in the IND district subject to conditional use review. Therefore, Section 4.5 provides additional scrutiny for hazardous material uses in the IND District. Nothing in Section 4.5, however, permits a hazardous materials use outside of the IND District. Because we conclude that the Project is a hazardous materials use, and as it is not proposed for the IND District, we conclude that it is not allowed regardless of compliance with conditional use criteria.

Furthermore, merely because propane, if stored appropriately, could be considered safe, says nothing about the hazardous nature of the material itself. Nearly any material, if stored correctly, can be made relatively safe, but storage methods do not render a material non-hazardous. Moreover, there is nothing in the Regulations to indicate that a material that is hazardous is exempt from the Regulations due to the method by which it is stored. To accept Applicants' argument would allow many harmful materials to escape local regulations by the sole fact that there are subject to strict safety standards. We therefore conclude that propane is a hazardous material as defined in Section 10 of the Regulations.

While propane may meet the definition of hazardous material, a project is only regulated as a hazardous materials use when "by its design or nature [it] is intended for the manufacture, processing, reprocessing, packaging, or storage of hazardous materials." Regulations § 4.5(A). In other words, when the purpose of the project is to handle hazardous materials, not merely that there may be some hazardous materials involved in the operation of the project, the project is a hazardous materials use under Table 2.1 and thus limited to the IND District.

Here, the Project's central purpose is the storage and distribution of a hazardous material—propane. The presence of the hazardous material is not incidental to the purpose of the Project. Rather, the sole function of the Project is to handle large quantities of propane. Therefore, we conclude that the Project is appropriately classified as a hazardous materials use as defined by the Regulations, and is therefore not allowed in the CM District.

Applicants argue that the Project cannot be classified as a hazardous materials use because the definition of hazardous material is vague and standardless, giving unbridled discretion to the DRB to regulate a vast array of products in nearly any amount. They claim that even something as innocuous as a wooden house could fit the definition because wood is flammable. We disagree and find the Regulations provide adequately clear standards.

Regulations are unconstitutionally vague when they either fail to provide sufficient notice for ordinary people to understand what conduct is prohibited, or allow arbitrary and discriminatory enforcement. In re Beliveau NOV, 2013 VT 41, ¶ 15, 194 Vt. 1. "The test for vagueness is less strict when applied to regulations that affect 'economic interests, not constitutional rights, and when the aggrieved party can seek clarification of its meaning or resort

to administrative processes.'" Id. (quoting In re Rusty Nail Acquisition, Inc., 2009 VT 68 ¶ 12, 186 Vt. 195). Generally, zoning regulations must provide adequate guidance to prevent unbridled discretion. See Beliveau, 2013 VT 41, ¶ 15. Even if a single provision, when read in isolation, appears general, it is not invalid if, when read in context and in conjunction with the entire ordinance, it provides "appropriate conditions and safeguards" to guide its applicability. See In re Pierce Subdivision Application, 2008 VT 100, ¶¶ 19–20, 194 Vt. 365; see also In re 232511 Invs., Ltd., 2006 VT 27, ¶ 8, 179 Vt. 409.

Applicants' argument ignores the context provided by the entirety of the Regulations, particularly the direction provided by Section 4.5(A). While the definition of hazardous materials, when read in isolation, does appear broad, the definition alone does not establish when a project or proposed use will be regulated or will not be allowed in a certain district. As we explain above, a project is only regulated as a hazardous materials use when it involves a hazardous material (as defined in Section 10), and when the project, "by its design or nature is intended for the manufacture, processing, reprocessing, packaging, or storage of hazardous materials." Considering the Regulations in their entirety, particularly Table 2.1 and Section 4.5, the Regulations provide adequate standards to guide whether a type of project will be deemed a hazardous materials use and thus are not vague or unenforceable.

As part of their vagueness claim, Applicants also suggest that they lacked notice that their Project might be classified as a hazardous materials use, and thus were deprived of due process. We find this claim unpersuasive. The Project does not involve some incidental use of hazardous materials, but rather seeks to store and distribute 60,000 gallons of liquid propane. As previously discussed, the Regulations provide sufficiently clear standards for hazardous materials. Even a cursory reading of the Regulations indicates that such a project could be subject to the additional standards governing hazardous materials. Applicants were, at the least, sufficiently aware of the possibility that the Project might be considered a hazardous material use to obligate them to seek clarification. Thus, we conclude that there is no due process concern regarding notice.

Lastly, Applicants argue that the Project should be classified as a "Storage/Distribution Facility," which is allowed as a conditional use in the CM District, instead of a hazardous materials use. In addressing this claim we are guided by our standard rules of statutory interpretation. Our

objective is to construe and effectuate the intent behind any regulation. See In re All Metals Recycling, Inc., 2014 VT 101, ¶ 9, 197 Vt. 481. We will look first to the plain meaning of the regulation, giving effect to every part. Id. If the plain meaning is not clear, we will construe intent from consideration of "the whole statute, the subject matter, its effects and consequences, and the reason and spirit of the law." Id. (quoting In re Carroll, 2007 VT 19, ¶ 9, 181 Vt. 383). In interpreting a provision, we will apply common sense, and we will adopt a reading that avoids unreasonable results. See Smith v. Town of St. Johnsbury, 150 Vt. 351, 355 (1988); In re Champlain Oil Co. Conditional Use Application, 2014 VT 19, ¶ 7, 196 Vt. 29.

Initially, considering the plain wording of the definition of a "Storage/Distribution Facility," there are several flaws in Applicants' claim. Section 10 of the Regulations defines a "Storage/Distribution Facility" as "[a]ny building or part thereof used for the storage, wholesale and distribution of manufactured goods and materials, and not as a primary location or outlet for business for retail use." Regulations § 10.2, at 94. The Project, however, does not propose to use *buildings* to store the propane, but rather two 30,000-gallon storage tanks. Second, while propane may be refined, it is not a "manufactured good." A commonsense plain reading suggests that a storage/distribution facility, as defined in Section 10 of the Regulations, is meant to encompass buildings, such as warehouses, that are intended as storage and distribution centers associated with a separate retail or consumer goods store, not to encompass any facility that provides storage of a material, particularly a hazardous material.

Nevertheless, assuming that the plain meaning is not clear and that the definition of a storage/distribution facility could be read to apply to the Project, a reasonable reading of Table 2.1 and Section 4.5 forecloses this conclusion. Both use categories—a hazardous materials use and a storage/distribution facility—do capture aspects of the Project. Yet to accept Applicants' argument that the storage/distribution facility use takes precedence because the storage of materials is involved ignores the Regulations' clear directive to treat separately those facilities that "store" or handle hazardous materials and would read out of existence the provisions specifically pertaining to hazardous materials. Therefore, we conclude that the hazardous materials use, defined through Table 2.1 and Section 4.5(A), must supersede other general use categories in Table 2.1 where the "manufacture, processing, reprocessing, packaging, or storage

of hazardous materials" is involved, notwithstanding the fact that the project could also be classified as another use.

This reading does not, however, conflict with the distinct treatment of gas stations from other hazardous material uses. Gas stations, while clearly handling hazardous materials, have been specifically identified by the Regulations as subject to a separate and distinct set of conditions. A familiar canon of statutory construction that directs that where there are two provisions of an ordinance, one specific and one general, that address the same subject, the specific must prevail. See In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 31, 199 Vt. 19. Because gas stations are more specifically regulated by the Regulations, they are not hazardous material uses, but rather subject to the distinct restrictions imposed on gas stations by the Regulations.

Ultimately, because the Project will store, handle, and process hazardous materials, and because there is no more specific use classification applicable to the Project, we conclude that the Project is appropriately classified as a hazardous materials use. As a result, the Project is not conditionally allowed in the CM District as a storage/distribution facility.

II.    Constitutional Claims

Applicants argue that the Regulations' disparate treatment of gas stations and propane storage facilities is discriminatory and is prohibited by the United States and Vermont Constitutions.

In Vermont, a municipality has broad power to enact zoning regulations and may enact and enforce regulations that govern the use of lands so long as the regulations are related to public health, safety, or welfare. See 24 V.S.A. § 4411(a); see also 24 V.S.A. § 4302. In so doing, the municipality may adopt regulations that permit and prohibit specific uses of land and may establish distinct districts where certain types of uses are permitted as of right, conditionally allowed, or not allowed at all. 24 V.S.A. § 4411(a); 24 V.S.A. § 4414.

According to Table 2.1 of the Regulations, gas stations are permitted subject to conditional use and site plan review in the CM District, the IND District, and in the Central Business District. The Regulations define a "Gas Station" as:

> Any lot or area of land including the building(s) on the land, which has facilities for fueling motor vehicles. Gas stations may offer for sale automobile or motor vehicle fuels, lubricants, and related motor vehicle products. This definition specifically excludes automobile repair, automobile sales, and the sale of food and unrelated convenience or grocery items.

Regulations § 10 at 94.

Applicants argue that gas stations handle equally large quantities of hazardous materials and pose no lesser peril to human health than a propane storage facility. Therefore, Applicants claim, by exempting gas stations from being regulated as a hazardous materials use and allowing gas stations in three of the Village's districts, the Regulations result in discriminatory treatment against Applicants' proposed use in violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution and the Common Benefits Clause of the Vermont Constitution. Applicants do not, however, argue that the Project involves a suspect class or fundamental right, or that the unequal treatment is based on the identity of the individuals rather than the operation that is proposed.

Under both the Vermont and federal constitutions, where there is no suspect class or fundamental right involved, a challenge to a regulation's different treatment of various uses is subject to rational basis scrutiny. See S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme, 539 F.Supp. 2d 524, 538–39 (D. Conn. 2008); Hodgeman v. Jard Co., 157 Vt. 461, 464 (1991). Under this level of scrutiny, "[i]f there is a rational basis for the distinctions, serving a legitimate policy objective," there is no constitutional violation. Smith v. Town of St. Johnsbury, 150 Vt. 351, 357 (1988). The burden is on the challenger to show that the distinction between uses is not rationally related to a legitimate government interest. See id.; see also McLaughry v. Town of Norwich, 140 Vt. 49, 54 (1981) (holding that zoning bylaws are presumed valid and the movant has the burden of proving that the bylaw is invalid).

As there is no suspect class or fundamental right involved here, Applicants must show that the differing treatment of gas stations compared to propane storage facilities and other hazardous material uses is not rationally related to a legitimate public interest—the protection of public health, safety, and welfare.

In their motion, Applicants claim that the distinction between propane distribution facilities and gas stations is illogical, but do nothing more than point out the differing treatment.

This argument ignores the many rational reasons for allowing gas stations in three of the Village's districts, but only allowing propane distribution facilities in the IND District. For example, while gas stations may pose some risks due to the fuel stored on site, the public relies on convenient access to gas stations on a daily basis to supply fuel for their vehicles. Cars are often the primary method of transport in Vermont, and are needed to travel to work, to recreation, and to perform many daily tasks. The public does not have a similar need to conveniently access propane storage and distribution facilities. The Village may have rationally determined that it is in the public's interest to allow gas stations in several districts despite the risk, but it is not for propane distribution facilities. Because there is a rational basis for the distinction between gas stations and propane distribution facilities, Applicants' constitutional claims must fail.

### Conclusion

For the foregoing reasons, the Court concludes that the Project is a hazardous materials use as defined by the Regulations and thus is not allowed in the CM District. We also conclude that Applicants have failed to demonstrate that the Regulations' treatment of Applicants' proposal is unconstitutional. We therefore **AFFIRM** the DRB's denial of Applicants' conditional use application.

A Judgment Order accompanies this Merits Decision. This concludes the proceedings currently before this Court.

Electronically signed on August 23, 2016 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division

-13-