NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 43

No. 2015-146

State of Vermont
                                                    Supreme Court

                                                    On Appeal from
    v.                                              Superior Court, Bennington Unit,
                                                    Criminal Division

Leo Reynolds                                        September Term, 2015


William D. Cohen, J.

Christina Rainville, Bennington County Chief Deputy State's Attorney, Bennington, for
  Plaintiff-Appellant.

Timothy M. Andrews and David F. Silver of Barr, Sternberg, Moss, Lawrence, Silver &
  Munson, P.C., Bennington, for Defendant-Appellee.


PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.    **REIBER, C.J.**   In this interlocutory appeal, the State challenges the trial court's suppression of defendant's pre-arrest confession to police. The State argues that the court erred in concluding that the confession was involuntarily made. We affirm.

¶ 2.    Defendant is charged with four felony counts of lewd and lascivious conduct with a child and one felony count of aggravated sexual assault on a victim younger than thirteen. Defendant was sixty-seven years old at the time of the charged conduct, and the alleged victim, defendant's neighbor Z.Z., was seven years old. Defendant filed a motion to suppress in October 2014, arguing that the incriminating statements he made were the product of police coercion and thus taken in violation of his constitutional rights.

¶ 3.    Following a hearing, the court granted defendant's motion.  It made numerous findings, including the following.  In late December 2013, a police detective contacted defendant and asked if he would come to the station to discuss a neighborhood complaint.  Defendant agreed to help if the detective would come to his house instead.  The detective arrived in plainclothes with no visible weapon.  He was accompanied by a caseworker from the Department for Children and Families.  After introducing themselves, the detective asked defendant if he could record his statement electronically.  Defendant consented, although he exhibited some confusion about the word "statement."  The detective did not conspicuously display his recording device during the interview.

¶ 4.    The detective began by asking defendant about his relationship with his neighbors and their children.  The detective did not immediately inform defendant that he was a person-of-interest in a criminal investigation, or answer defendant's questions about why he was there.  Defendant responded to the detective's question about his neighbors, and about the layout of his home.  Defendant seemed confused but relaxed during this line of questioning.

¶ 5.    After about four minutes, the detective disclosed the general reason for his questions.  He told defendant that Z.Z. had "talked about some inappropriateness that went on."  Defendant was audibly taken aback.  Defendant agreed with the detective that Z.Z. was not the type of child who would make things up or try to get someone in trouble.  When defendant continued to indicate no understanding of where the conversation was headed, the detective stated that Z.Z. had "talked about touching each other's privates."

¶ 6.    Defendant indicated that he was having trouble processing the conversation.  The detective continued with his questioning.  The court found that the detective's questions featured numerous confession-driven techniques, the most important of which was a suggestion that few or no legal repercussions would follow if defendant admitted to a mistaken touch.  The court

found the overall tone of the exchange to be one of intense suspicion, and it indicated that the audiotape fully captured the interrogation's accusatory, antagonistic, and unyielding nature.

¶ 7.   After half an hour of talking to the detective, defendant admitted to inappropriately touching Z.Z.  Defendant told the detective that "It just happened. . . .  Like you said."  He then answered yes or no to the detective's targeted follow-up questions.  The court found that defendant offered almost no details of his own.  The court was not persuaded by the detective's attempt at the hearing to validate the approach he had taken.

¶ 8.   Defendant testified that, during the interview, he was suffering from a panic attack that prevented him from thinking clearly about the allegations.  He indicated that his goal was to get out of the immediate, stressful situation.  According to defendant, he confessed because he believed it was the only way to end the interrogation, and he believed the detective was promising him treatment, not jail, as long as he said that the touching was a mistake.  The court found defendant considerably more credible than the detective.

¶ 9.   Based on these and other findings, the court concluded that the State failed to prove by a preponderance of the evidence that defendant confessed voluntarily.  See State v. Robinson, 158 Vt. 286, 294, 611 A.2d 852, 856 (1992) (identifying State's burden of proof), abrogated on other grounds by State v. Carter, 164 Vt. 545, 550, 674 A.2d 1258, 1262 (1996); see also State v. Pontbriand, 2005 VT 20, ¶ 21, 178 Vt. 120, 878 A.2d 227 (explaining that State must show that "coercive governmental conduct" did not "play[] a significant role in inducing the statement").   The court determined that the detective's seven unrelenting questioning strategies and other enhancing circumstances played a significant role in inducing defendant's confession.  Most importantly, the court found that the detective made a series of promises that if defendant would admit to a mistaken or accidental touch, he would not face criminal sanctions, and defendant testified that this played a significant role in his confession.  The detective also periodically portrayed himself as defendant's ally; pandered to defendant's

good reputation in the community; and reminded defendant that they were in his home and not the police station. The court found that defendant had limited experience with law enforcement and that it was reasonable for him to believe that the detective was promising him treatment but no jail time if he capitulated to the "mistake" paradigm. The court further concluded that the coercive atmosphere was enhanced because the detective led defendant to believe that this was his last opportunity to strike a deal, the detective refused to disclose the reason for the interrogation before it began, and he did not remind defendant of his right to terminate the interview at any time. Considering these techniques in conjunction with defendant's stammering and other signs that he was not processing the allegations well, the court concluded that the overbearing nature of the interview became unmistakable.

¶ 10.   The court found it unnecessary to consider defendant's claim that he was having a panic attack during the interview because the State failed to show that its technique was sufficiently protective of defendant's fundamental constitutional rights, even absent a special vulnerability. According to the court, the circumstances showed that the challenged statements more likely resulted from defendant's resignation to a barrage of false promises and other tactics than from a sudden will to admit wrongdoing. The court thus concluded that the State failed to prove that defendant's confession was "the product of a rational intellect and the unfettered exercise of free will." State v. Sullivan, 2013 VT 71, ¶ 37, 194 Vt. 361, 80 A.3d 67 (quotation omitted). Accordingly, it granted defendant's motion to suppress. The State appealed.

¶ 11.   The State argues that the court erred as a matter of law in finding the confession involuntary. It contends that there were no threats made to defendant, and that defendant decided on his own to tell the truth. It challenges the court's finding that defendant was credible and its conclusion that his will was overborne. According to the State, the evidence shows that: defendant lied to the court repeatedly; after he confessed, he continued to admit some things and deny others; and he acknowledged at the hearing, without coercion, that he told the truth during

4

the interview. The State cites other cases where we have found confessions voluntary, and argues that we should reach the same result here.[1]

¶ 12. As reflected above, "[w]hen a defendant challenges a confession or inculpatory statement, the prosecution must establish by a preponderance of the evidence that the confession or statement was made voluntarily." Pontbriand, 2005 VT 20, ¶ 22. A voluntary statement is one that is "the product of a rational intellect and the unfettered exercise of free will." Sullivan, 2013 VT 71, ¶ 37 (quotation omitted). We recognize that "the police may use some psychological tactics in eliciting a statement from a suspect," and "[e]ven where such tactics have an impact on a suspect's decision to talk to the police, the resulting statements are voluntary so long as they reflect a product of the suspect's own balancing of competing considerations." Pontbriand, 2005 VT 20, ¶ 22 (quotations omitted). "A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement." Id. ¶ 21.

¶ 13. On review, we must determine if, "under the totality of the circumstances, the confession was obtained in a manner consistent with the Constitution." Miller v. Fenton, 474 U.S. 104, 117 (1985). The Supreme Court has stated that "both the characteristics of the accused and the details of the interrogation" are relevant in assessing "the totality of all the surrounding circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (citations omitted). With respect to the former, the Court cited as examples, the youth of the accused, his or her lack of education, or low intelligence. Id. The Court has also recognized that "assessments of credibility and demeanor are not crucial to the proper resolution of the ultimate issue of 'voluntariness.' " Miller, 474 U.S. at 117. Nonetheless, there are "subsidiary questions, such as

---

[1] The State also suggests that the court misstated the test for voluntariness by finding that the detective's technique "was not sufficiently protective of defendant's fundamental constitutional rights." We find it evident that the court applied the appropriate legal standard, but in any event, as we are reviewing the court's legal conclusion de novo, any error is harmless.

the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings, [that] often require the resolution of conflicting testimony of police and defendant." Id.

¶ 14.    We have issued conflicting statements about whether "voluntariness" is a question of fact or law. See, e.g., Sullivan, 2013 VT 71, ¶ 38 (recognizing that this Court has "previously suggested that voluntariness of statement for purposes of Vermont Constitution is question of fact," but has also recognized that "voluntariness of confessions under U.S. Constitution is question of law"). The trial court here based its decision on the federal constitution and thus, we employ the well-established standard of review employed by the federal courts. "Without exception, the Court's confession cases hold that the ultimate issue of 'voluntariness' is a legal question . . . ." Miller, 474 U.S. at 109; see also State v. Weisler, 2011 VT 96, ¶ 12, 190 Vt. 344, 35 A.3d 970 (recognizing that standard of review governing the voluntariness of confessions is "generally de novo" and citing cases). We defer to the historical facts as found by the trial court,[2] but we review de novo "the ultimate issue" of "whether the State has obtained the confession in a manner that comports with due process." Miller, 474 U.S. at 110.

¶ 15.    We agree with the trial court that the totality of the circumstances here shows that "coercive governmental conduct played a significant role in inducing" defendant's confession. Pontbriand, 2005 VT 20, ¶ 21. Our conclusion is based on the detective's inappropriate promises of leniency, coupled with the detective's misrepresentation of his authority. The other techniques employed by the detective would not necessarily be problematic but they become significant here because they enhanced the effectiveness of the two key factors identified above.

---

[2] We note that our standard for reviewing findings of fact based on the audiotape of the interview is the same as for other findings. See In re M.K., 2015 VT 8, ¶ 15 n.*, 198 Vt. 233, 114 A.3d 107 (noting that while Supreme Court had viewed a video as part of the record of the proceedings below, standard for reviewing findings regarding video was same as with other evidence presented in case, and Court would not make appellate findings based on its viewing of video).

6

¶ 16.  The Supreme Court stated long ago that "a confession is inadmissible as involuntary if obtained by any direct or imposed promises, however slight." Bram v. United States, 168 U.S. 532, 542-43 (1897), quoted in State v. Roberts, 160 Vt. 385, 388, 631 A.2d 835, 837 (1993).  As numerous courts have recognized, "[t]he Bram test has not been interpreted as a per se proscription against promises made during interrogation, and the test has been tempered by subsequent holdings that, depending on the totality of the circumstances, certain representations will not render a confession involuntary." Hawkins v. Lynaugh, 844 F.2d 1132, 1140 (5th Cir. 1988) (quotation omitted); see also State v. Pillar, 820 A.2d 1, 13 (N.J. Super. 2003) ("[W]hat had once been considered virtually a per se rule that promises or suggestions of leniency made to a defendant in the absence of counsel render any subsequent confession involuntary has evolved into a totality of the circumstances test in which any promises or threats by police officers are simply one factor to be considered." (citations omitted)).  In assessing the effect of a promise under the totality of the circumstances, relevant factors include "the nature of the promise, the context in which the promise was made, the characteristics of the individual defendant, whether the defendant was informed of his rights, and whether counsel was present." Pillar, 820 A.2d at 13-14 (quotation and additional citations omitted).

¶ 17.  We have distinguished promises from mere predictions.  See, e.g., Hawkins, 844 F.2d at 1139 ("A promise is not the same thing as a prediction about future events beyond the parties' control or regarded as inevitable." (quotation omitted)).  Unlike predictions, "[p]romises . . . convey the expectation of a benefit that the officer has, in the defendant's eyes, the power either to grant or withhold." Roberts, 160 Vt. at 389, 631 A.2d at 830.  In determining if a promise has been made, we view statements "from the defendant's, not the interrogator's perspective, applying a reasonableness standard." Pillar, 820 A.2d at 14 (quotation and brackets omitted).  The "question is whether or not the promise likely would lead to a false confession." Herrera v. State, 194 S.W.3d 656, 660 (Tex. App. 2006); see also State v. Gard, 358 N.W.2d

7

463, 468 (Minn. App. 1984) (concluding that officer made oral representations that could reasonably be construed as promises to induce a confession, and that under totality of circumstances, "respondent could reasonably have believed that his statements would not be used against him if he agreed to talk to the deputy").

¶ 18. We have held that an "officer's statement that he would convey the defendant's cooperativeness to the State's attorney" was a prediction, not a promise, and that it was insufficient by itself to make the defendant's subsequent confession involuntary. State v. Beckley, 157 Vt. 446, 449, 600 A.2d 294, 296 (1991). In reaching our conclusion, we observed that although general statements about the value of cooperation do not taint a confession, "a promise that cooperation by the defendant will aid the defense or result in leniency" would. Id. (quotation and brackets omitted). We recognized that, "in the totality of the circumstances, a confession induced by a promise by a law enforcement agent to lessen charges or seek lighter punishment is involuntary." Id.

¶ 19. In Roberts, we held that an officer who told a defendant that his statement might result in reduced bail was making a "mere prediction[] regarding the value of cooperation," which was "not sufficiently coercive to render a subsequent confession involuntary." 160 Vt. at 388-89, 631 A.2d at 837. We considered it significant that "[t]he officer did not personally promise to provide any benefit to defendant, other than to convey the fact of defendant's cooperation to the judge and indicate that the judge might consider when setting bail, that defendant had given a statement." Id. at 389, 631 A.2d at 838. There were also no findings to suggest that the defendant "perceived the officer as having the authority to directly provide him with any benefit." Id. Thus, in the absence of any promise, we concluded that the officer's statement did not render the defendant's confession involuntary. Id.; see also State v. Bacon, 163 Vt. 279, 294, 658 A.2d 54, 64-65 (1995) (concluding that officers' suggestions that defendant's limited role in murder or absence of premeditation might reduce offense or sentence

8

was a prediction, which is rarely viewed as sufficiently coercive to render confession involuntary, and noting that statement did not appear to have had much effect on defendant).

¶ 20. The statements made by the officer in this case differ from the predictions discussed above. These statements included the following:

> "[M]istakes happen. Curiosity sometimes gets the best of us, okay? . . . That I can understand and that I can deal with."
>
> "We can solve a mistake."
>
> "[M]istakes can be forgiven."
>
> "I've dealt with guys who've made mistakes. We can deal with a mistake. I can help you with a mistake. I can't help you with the other. We're done with the other.

These statements implied that the defendant's cooperation would "result in leniency," the precise type of promise we identified as inappropriate in Beckley, 157 Vt. at 449, 600 A.2d at 296. But see Hawkins, 844 F.2d at 1140 (concluding that although officer's promise of "help" to defendant might arguably be heard to mean that defendant would receive counseling in lieu of imprisonment, officer made no direct promise of leniency, and at most implied lenient treatment, and "indirect promises do not have the potency of direct promises"). Compare People v. Conte, 365 N.W.2d 648, 663 (Mich. 1984) (stating that a "promise need not be express, as subtle intimations can convey as much as express statements," and concluding that "there is no room for a distinction between tacit and express understandings" (quotation and brackets omitted)). The detective implied that defendant would face treatment or complete absolution if he confirmed the "mistake" theory while signaling that harsher consequences would follow a determination that he intentionally touched the child. He told defendant:

> "The only way to deal with it is to talk so that I can get you the help that you need, or somebody you can talk to figure out why it happened, because I don't want it to happen to somebody else."
>
> "[Mistakes] can be forgiven and easily taken care of, but . . . I can only help you if you want to help yourself . . . . it's like being a

9

drug addict or an alcoholic. If you don't want to help yourself, I can't help you."

The officer also told defendant: "I could have took [sic] a different direction, but because I think it was a mistake, and you are a good person, and you made a bad decision that's why I decided to come here. The only reason." This implied to defendant that if he admitted to a mistake, he might not be arrested and suggested that the officer had the power to make such a decision. The officer misrepresented the law by suggesting that "mistaken touches" would result only in treatment. He also misrepresented his authority by repeatedly using the word "I" to describe how a confessed mistake would be "deal[t] with," implying that defendant could strike a bargain with the detective if he agreed to confess.

¶ 21. As the trial court found, the effect of these promises was enhanced by the other techniques used by the detective, techniques that standing alone are not necessarily problematic. This includes the detective periodically portraying himself as defendant's ally; pandering to defendant's good reputation in the community; and reminding defendant that they were in his home and not the police station. Defendant had limited experience with law enforcement, and we agree that, under the totality of the circumstances, a reasonable person in defendant's position could believe that the detective was promising him treatment but not jail if he capitulated to the "mistake" paradigm. The coercive atmosphere was further enhanced because the detective refused to disclose the reason for the interrogation before it began; he did not remind defendant of his right to terminate the interview at any time; and he led defendant to believe that that this was his last opportunity to strike a deal, saying "This is your opportunity with me now. You only get one."

¶ 22. The State argues that this case is like Pontbriand, 2005 VT 20, where we concluded that a defendant, who was interrogated by two police officers in his hospital room, voluntarily confessed. We disagree. Most importantly, there were no promises of leniency

10

involved in Pontbriand. Additionally, the officers there immediately informed the defendant that they worked for a special unit that investigated sexual offenses and showed the defendant a copy of an incriminating email that the defendant had sent his girlfriend; they told the defendant that he was not under arrest and that he did not have to talk to them; they informed him that "[w]e are cops" and that "sometimes people go to jail," and repeated that they wanted to make sure the defendant wanted to talk to them. Id. ¶ 23.

¶ 23. While the officers also told the defendant that "this was his opportunity to tell his side of the story and that they were not going to come back again," id. ¶ 4, we did not consider this statement, in the totality of the circumstances, to have contributed to a coercive atmosphere. Id. ¶ 28 (noting that other courts hold that "police statements to a suspect suggesting he or she has one last chance to talk are not conclusive evidence of coercive questioning"). We noted that the defendant "had not yet been charged with a crime when he was interviewed," and concluded that "[a] person in his position could reasonably have anticipated that, even if the police declined to question him again, he would still have the opportunity to present his side of the story in court." Id. ¶ 29. Because there was no other evidence of coercive interrogation tactics, we found this statement insufficient to render the defendant's further participating in the conversation involuntary.

¶ 24. The State argues that, like the defendant's confession from his hospital bed in Pontbriand, we should find defendant's confession voluntary here. It cites our statement in Pontbriand that "[i]n the absence of a threatened adverse consequence—like the threat of physical harm or repercussions against family members—for refusing to answer questions, [the defendant's] decision to continue the interview was a product of his own balancing of competing considerations." Id. ¶ 27 (quotation omitted). It maintains that the officer here made no threats. It also argues that the officer's statement that defendant would have one opportunity to speak with him is similar to the statement discussed above.

11

¶ 25. We find these arguments unpersuasive. First, the statement concerning adverse consequences must be considered in the context in which it was made. It was not intended to limit the voluntariness analysis to a single factor and eliminate any consideration of the effect of promises or other elements that might be present in other cases. The totality of the circumstances here differ significantly from those present in Pontbriand. The officer's statement about defendant having one opportunity to talk to him, moreover, is but one small piece of the larger picture of coercion here, and this statement enhanced the effectiveness of the officer's implied promises of leniency and the misrepresentation of his authority.

¶ 26. The State also cites In re M.A., 2011 VT 9, 189 Vt. 354, 22 A.3d 410, where the defendant was intellectually disabled; the interrogation lasted four hours and occurred at the police station; and the detective told the defendant that the interview was "private" and "you're not in trouble anyways." Id. ¶ 4. The State argues that the circumstances in M.A. were more egregious than those here yet we found the defendant's confession voluntary.

¶ 27. The question presented in M.A. differs from that presented here, and we distinguish it on this basis. In M.A., we considered whether the trial court erred in finding that the defendant presented a danger of harm to others, and thus was "in need of custody, care and habilitation" under 18 V.S.A. § 8839. The trial court found by clear and convincing evidence that the defendant had committed sexual assaults and lewd or lascivious conduct against the victim, and was therefore a danger to others. M.A., 2011 VT 9, ¶ 8. In reaching its conclusion, the court found that the defendant had voluntarily made incriminating statements during a police interview. On appeal, the defendant argued that his confession was unreliable because his mental deficiencies rendered him easily overborne by extensive, coercive questioning. He presented expert testimony to this effect. Based on this argument, and his assertion that the victim's testimony was also unreliable, the defendant argued that there was insufficient evidence that he presented a danger of harm to others.

¶ 28. We reviewed the trial court's decision for clear error, and affirmed its ruling. In doing so, we cited the trial court's finding that "the officer's questioning techniques, while 'persistent' and 'sophisticated,' were not 'abusive or threatening' and contained 'no improper promises of leniency, or undue psychological trickery,' and that [the] defendant's will was not overborne." Id. ¶ 17. In considering the defendant's reliability argument, we deferred to the trial court's assessment of the credibility of witnesses and the weight of the evidence, and concluded that the defendant failed to show that the court's findings concerning the absence of coercion were clearly erroneous. Id. ¶ 18. Given that the defendant's argument in M.A. was premised on the unreliability of his confession, and given that we were deferring to the trial court's assessment of the weight of the evidence, we do not find this case persuasive here.

¶ 29. We thus turn to the State's remaining arguments. The State asserts that defendant admitted twice at the suppression hearing that his confession was the truth. It maintains that this shows that defendant was not coerced during his interview with police. We disagree. "Whether true or false, a confession given involuntarily is inadmissible in a criminal trial." Beckley, 157 Vt. at 448, 600 A.2d at 295. "The reason for excluding involuntary confessions is the likelihood their being fabricated in the hope of escaping punishment, or obtaining leniency." State v. Cocklin, 109 Vt. 207, 213, 194 A. 378, 380 (1937). Even assuming that defendant admitted to "telling the truth" at the suppression hearing, this has no bearing on our voluntariness analysis.

¶ 30. The State also challenges the trial court's finding that defendant was more credible than the detective, and it cites reasons why defendant should have been deemed not credible. As set forth above, defendant's credibility is not central to the voluntariness analysis. See Miller, 474 U.S. at 116-117 (stating that "assessments of credibility and demeanor are not crucial to the resolution of the ultimate issue of 'voluntariness' "). We have evaluated the totality of the circumstances from the perspective of a reasonable person in defendant's position,

and as set forth above, conclude that defendant could have reasonably believed the offer would ensure that he received more lenient treatment if he confessed to a mistaken touch.

¶ 31. Finally, the State argues that the court erred by failing to decide its motion that requested permission to examine defendant, instead declaring that the court would hold a suppression hearing limited only to the detective's techniques, and then taking testimony about defendant's mental condition and making assessments of his credibility, without allowing the State to have an expert examine him as permitted by V.R.Cr.P. 16.1.

¶ 32. Rule 16.1 allows a judicial officer to require a defendant to submit "to a reasonable mental examination by a psychiatrist or other expert" if a defendant gives notice "that expert testimony will be offered as provided in [V.R.Cr.P.] 12.1." V.R.Cr.P. 16.1(a)(1)(I). Defendant was not allowed to present expert testimony at the suppression hearing, and the basis of the trial court's analysis was an objective assessment of voluntariness, not dependent on defendant's special vulnerabilities. For these reasons, even if the court's failure to allow the State to conduct an examination under V.R.Cr.P. 16.1 was error—a question we do not decide— we discern no prejudice from the trial court's failure to allow the examination.

Affirmed.

FOR THE COURT:

_____
Chief Justice

14