This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 131

No. 2017-291

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Addison Unit, |
| | Criminal Division |
| | |
| Rein Kolts | September Term, 2018 |

Samuel Hoar, Jr., J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Joshua S. O'Hara, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **CARROLL, J.** Defendant appeals his conviction by a jury for aggravated sexual assault of a child. On appeal he makes four arguments. First, he claims that his confession—that he repeatedly had sex with his niece, A.H.—should have been suppressed because law enforcement obtained it by interrogating him in a custodial setting without advising him of his Miranda rights. He also claims that his confession was involuntary because he was coerced by police. Next, defendant argues that the trial court abused its discretion when it excluded testimony by his two expert witnesses. Last, defendant asserts that the trial court erred when it instructed the jury that it could decide that he confessed voluntarily even if it determined that the police's use of psychological tactics contributed to his confession. We affirm.

¶ 2.    In the spring of 2014, Detective Sergeant Ruth Whitney of the Addison County Sheriff's Department received a tip from an officer in New Hampshire to investigate defendant for having sexually assaulted his niece, A.H., a New Hampshire resident.  A.H. had reported to New Hampshire officials that defendant repeatedly assaulted her over the course of the previous two years when she visited him in Vermont, starting when she was eleven years old.  Detective Whitney interviewed A.H. and then interviewed defendant.  As detailed below, defendant confessed to Whitney that he had repeatedly had sex with A.H.  He was arrested and subsequently charged.

¶ 3.    Defendant moved to suppress his confession.  The trial court held a motion hearing at which Detective Whitney testified.  After accepting supplemental briefing, the court denied defendant's motion.  Also before trial, defense counsel notified the State that defendant planned to call two experts in clinical psychology, Paula Nath and Charles Rossi, to testify about why, in their opinion, defendant's confession was false.  After deposing them the State moved to exclude their testimony from trial for failing to meet the requirements of Vermont Rule of Evidence 702. The court held a motion hearing at which Nath testified.  Transcripts from both expert depositions were admitted and defense counsel proffered the conclusions to which Rossi would testify at trial, if permitted.  The court granted the State's motion to exclude and later denied defendant's motion to reconsider.

¶ 4.    Defendant was tried by a jury and convicted of aggravated sexual assault of a child and aggravated sexual assault of a victim under thirteen.  By stipulation, the trial court only entered judgment on the count for aggravated assault of a child.  Defendant now appeals.

I.  Defendant's Suppression Motion

¶ 5.    Defendant argues that the trial court should have granted his suppression motion on two grounds.  First, he should have been given Miranda warnings because he was in custody when he was interviewed by Detective Whitney.  Second, his confession was involuntary.  This Court accepts a trial court's factual findings regarding a suppression motion unless they are clearly

2

erroneous. State v. Pontbriand, 2005 VT 20, ¶ 12, 178 Vt. 120, 878 A.2d 227. But we review legal conclusions—such as whether law enforcement conducted a non-custodial interrogation and whether defendant confessed voluntarily—de novo. Id.

¶ 6. The trial court found the following facts in connection with the suppression motion, which are supported by the record and unchallenged by defendant on appeal. After receiving a tip from New Hampshire officials, Detective Whitney began her investigation by interviewing A.H. Then she notified the Vermont Department for Children and Families (DCF) of the allegations. DCF alerted the Shoreham School District, where defendant worked as a bus driver. The school district suspended him from work and told him to contact DCF. An official with DCF told defendant to contact Detective Whitney to find out why he was suspended. He telephoned her twice but did not reach her. She called back and asked to speak to him in person either at the police station or his home. Defendant selected the station and agreed to come in the next morning. He drove himself. He was not, to any degree of consequence, impaired by drugs.[1]

¶ 7. Detective Whitney greeted him in the lobby and he followed her up the stairs through an unlocked door and into the unit where she worked. Just before entering her unit, there was a "clearly marked exit sign." Detective Whitney led defendant into a room that had been designed for interviewing crime victims rather than suspects: it was carpeted and furnished with a sofa, a coffee table, a lamp, and two upholstered chairs. Framed artwork decorated the walls. A video camera recorded the entire interview.

¶ 8. Detective Matthew Wilson, who was armed, joined them inside. The officers closed—but did not lock—the door to this room. Defendant sat on the sofa, placing his arm around

---

[1] Defendant and his spouse testified at the suppression hearing on the topic of his possible use of a prescription drug on the morning of his confession. Defendant explained that this affected his cognitive ability. The trial court weighed the evidence on this topic and concluded that defendant was not impaired in any way that affected his ability to make rational decisions. Defendant does not challenge this finding on appeal.

the back of it, appearing relaxed and comfortable. The detectives sat in the chairs. Detective Whitney asked defendant for permission to record their interview and defendant assented. Defendant asked if he could have a witness present for the interview, to which Detective Whitney responded that he could if he chose to have one. Defendant did not then make a request to have a witness present.

¶ 9. Before the detectives asked any questions about the allegations, speaking calmly, Detective Whitney told defendant "You don't have to be here," and, "You can leave any time you want." She then reiterated to him that "Any time you want to stop answering our questions or you want to leave, there's the door, you're free to go. . . . No hard feelings." Defendant stayed. The detectives spoke in calm, often friendly tones throughout the interview. This is borne out by the video recording of the interview.

¶ 10. Defendant and the detectives chatted for several minutes—about topics unrelated to this case—before defendant asked them to tell him the allegations that had been made against him. The detectives explained that defendant's niece, A.H., had accused him of being "sexually inappropriate" with her, to which defendant replied—with flat affect—that he was "shocked." He had expected their questioning to be related to his job. The detectives elaborated that A.H. said she and defendant had engaged in sexual activity many times. Defendant denied this. The detectives then specified the type of sexual act that A.H. alleged had taken place. Again, defendant denied the allegations.

¶ 11. Detective Whitney told defendant that she had physical evidence to support A.H.'s charges. Defendant asked whether this meant that there was DNA evidence, to which the detective responded, "Yeah. What's the—what's the explanation? How did your DNA . . . your transfer of body fluids, or cells, or hairs . . . get on A.H. and into A.H.? How did that happen?" The police did not have any such evidence. Initially, defendant dodged answering the question. Detective Whitney asked again how defendant's cells could have transferred onto A.H. if, as defendant

4

maintained, they did not have sex. "I can't figure that out. And I'm looking for you to tell me how that happened," Detective Whitney said. Detective Wilson interjected that A.H. would not have fabricated the allegations. Defendant replied nervously, "Yeah. I'm going to jail." Despite his shaken tone of voice, defendant maintained a relaxed posture, perched on the sofa.

¶ 12. Detective Wilson continued that A.H. would have to testify in court. Defendant said he did not want that to happen and asked how he could prevent her from having to testify. The detectives explained that was "up to you" if "you . . . come clean." In response, defendant confessed that he had repeatedly had sexual intercourse with A.H. The detectives then advised him that he was no longer free to leave and read him his <u>Miranda</u> rights, which he waived. After advising him of his rights, defendant continued his confession by describing sexual encounters with A.H. in greater detail and by lamenting that he should have anticipated that A.H. would eventually tell a friend what he had done, leading to his apprehension by the police.

A. Defendant Was Not in Custody When He Confessed

¶ 13. Before police interrogate a suspect in their custody, they must remind the suspect of his or her right to refrain from speaking. <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966). But <u>Miranda</u> does not apply to a suspect who is not in custody. <u>State v. Garbutt</u>, 173 Vt. 277, 282, 790 A.2d 444, 448 (2001). A defendant seeking to suppress his or her statements "bears the burden of proving that he [or she] was 'in custody' and, therefore, entitled to <u>Miranda</u> warnings." <u>State v. LeClaire</u>, 2003 VT 4, ¶ 15, 175 Vt. 52, 819 A.2d 719. Custody means a "formal arrest" or its functional equivalent: "restraint on freedom of movement of the degree associated with a formal arrest." <u>Id</u>. ¶ 16 (quotation omitted). Courts must consider the totality of circumstances to decide if a reasonable person would believe he or she had been effectively placed under arrest. <u>Garbutt</u>, 173 Vt. at 282, 790 A.2d at 448. There is no single determinative factor that must be considered in every case. <u>State v. Muntean</u>, 2010 VT 88, ¶ 19, 189 Vt. 50, 12 A.3d 518. The "critical question" is whether law enforcement conveyed, through words or deeds, that defendant was not

5

free to leave. State v. Hieu Tran, 2012 VT 104, ¶ 11, 193 Vt. 148, 71 A.3d 1201 (explaining this factor "necessarily" influences whether reasonable person would feel free to leave); United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990) (noting that informing suspect that they are free to leave is "[t]he most obvious and effective means of demonstrating that a suspect" is not in custody). Here, several factors support the conclusion that defendant was not in custody when he confessed.

¶ 14. First, Detective Whitney plainly and repeatedly told defendant that he could end the interview and was free to leave at any time. This critical fact distinguishes this case from Muntean, 2010 VT 88. In Muntean, we determined that the defendant was in custody when he voluntarily went to the police barracks to give a statement. That determination rested, in large part, on the fact that law enforcement did not tell the defendant that he could leave. 2010 VT 88, ¶¶ 25-27. The facts here are more similar to Pontbriand, where we held that the defendant was not in custody when police officers interviewed him in his hospital bed as he was recovering from a serious illness. 2005 VT 20, ¶ 20. In Pontbriand, as here, police confronted the defendant with incriminating evidence of a serious crime. They also told him he was not under arrest and that he had to participate willingly. We held that these facts "cut[] against the conclusion" that Pontbriand was in custody. Id. ¶ 19 (quotation omitted). Similarly, Detective Whitney's statements to defendant weigh against a conclusion that he was in custody.

¶ 15. Second, the detectives spoke in calm tones throughout the interview and were not aggressive in their demeanor. See United States v. Bassignani, 575 F.3d 879, 884 (9th Cir. 2009) (explaining that use of aggressive tone of voice would support custody). And the detectives did not directly accuse defendant of a crime. They simply asked that he explain alleged evidence against him and only did so after he sought the information from them. In contrast, we held in Muntean that the defendant was in custody in part because the interviewer repeatedly expressed certainty in the defendant's guilt and used "accusatory" questioning. 2010 VT 88, ¶ 28 (quotation

6

omitted). Similarly, in <u>Hieu Tran</u>, we concluded that the defendant was in custody in part because officers told the defendant that they could arrest him based on evidence that they already had before questioning him. 2012 VT 104, ¶ 15. The detectives here did not tell defendant that he could be arrested until after he confessed. And they made no allegations against him until after he requested this information from them. The detectives' demeanor, tone, and questions during the interview did not belie Whitney's statement that defendant was free to leave. See <u>State v. Oney</u>, 2009 VT 116, ¶ 36, 187 Vt. 56, 989 A.2d 995 (Johnson, J., dissenting) ("Where the questioning is particularly accusatory or aggressive, statements that the defendant is free to leave become no more than rote recitals. . . . Simply put, there are times when actions speak louder than words.").

¶ 16. Third, defendant voluntarily went to the police station to be interviewed, which favors the conclusion that he was not in custody.[2] See <u>Oney</u>, 2009 VT 116, ¶ 13. Indeed, Detective Whitney gave defendant the choice of speaking with her at his home or at the station. He chose the station and selected a convenient time; drove himself there, entering through a public door; then followed Detective Whitney up the stairs and into the interview room—passing a marked exit sign—without officers applying any force or restraint to him.

¶ 17. Fourth, the interview was short; it lasted only thirty-five minutes from the time defendant entered the interview room until the police <u>Mirandized</u> him. This was not a "marathon session designed to force a confession." <u>Davis v. Allsbrooks</u>, 778 F.2d 168, 171 (4th Cir. 1985) (weighing two-hour interview in favor of no custody under the circumstances); <u>United States v.</u>

---

[2] Defendant argues that he did not arrive at the station voluntarily because the officers had gotten him suspended from his job, and he believed he had to talk to Detective Whitney to go back to work. However, defendant and his interviewers had no employment relationship; it was the school district that, in defendant's words, "held the keys" to his employment. See <u>Pontbriand</u>, 2005 VT 20, ¶ 14 (explaining that custody means deprivation of freedom in significant way by law enforcement). And officers did not "work through official channels" to suspend defendant from his job. They simply reported A.H.'s allegation to DCF, as required by law. 33 V.S.A. §§ 4913-4914. Defendant's subjective belief that he needed to speak to the officers is irrelevant to a custody analysis. See <u>Garbutt</u>, 173 Vt. at 282, 790 A.2d at 448.

Ramos, No. 1:11-CR-111, 2012 WL 1854747, at *13 (D. Vt. May 21, 2012) (noting that thirty-minute interview is supportive of no-custody determination).

¶ 18.     Fifth, when defendant asked the detectives if he could have a witness present during his questioning, they told him that he could.  We have relied on the presence of third parties during questioning when assessing custody.  State v. Willis, 145 Vt. 459, 476, 494 A.2d 108, 117 (1985).  An officer's willingness to have a witness present, communicated to a suspect—even if no witness actually arrives—provides a modicum of support for a no-custody determination under Miranda, which is particularly concerned with "incommunicado interrogation." 384 U.S. at 445.

¶ 19.     Last, we recognize that conducting an interview at a police station may, in some circumstances, support the conclusion that a defendant was in custody.[3]  Muntean, 2010 VT 88, ¶ 23.  But where, as here, police treat a suspect essentially like a witness, and an interview takes place in a comfortable, unlocked room with a clearly marked and unobstructed exit, the fact that the interview occurred within the station may not warrant a holding that the defendant was in custody.  See United States v. Littledale, 652 F.3d 698, 702 (7th Cir. 2011) (holding defendant not in custody; interview conducted at station in "private office" not "interrogation room"); Graham v. United States, 950 A.2d 717, 729 (D.C. 2008) (concluding interview not custodial where defendant treated at station like a witness not a suspect); State v. Washington, 68 P.3d 134, 151 (Kan. 2003) (determining defendant not in custody while he sat in victim room and could watch television).

¶ 20.     Defendant argues that the interview became custodial when the detectives falsely told him that there was DNA evidence of his guilt.  In Oregon v. Mathiason, the Court held that

---

[3]  Defendant argues that the location of his confession, "in the guts" of a police station, creates a presumption that he was in custody.  This is incorrect.  The setting alone is not determinative; other factors, such as the nature of the room, where defendant was sitting, and whether the door was locked, may outweigh the fact that the interview takes place in a police station.  Oney, 2009 VT 116, ¶ 16 ("Custody is not established simply because the questioning takes place in a police station or because the questioned person is one whom the police suspect.").

the defendant was not in custody even though an officer falsely told the defendant that his fingerprints had been found at the scene of a bank robbery, because the other circumstances of the interview—the defendant voluntarily came to the police station, was told that he was not under arrest, and left after speaking to police for half an hour—did not support a conclusion that the defendant was in custody. 429 U.S. 492, 493-96 (1977). The Court explained that, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it." Id. at 495. This is because the interviewing officer is "part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Id. However, "police officers are not required to administer Miranda warnings to everyone whom they question." Id. Following Mathiason,[4] other courts have held that an otherwise non-custodial interview does not necessarily convert to a custodial interview simply because police confront a suspect with false incriminating evidence. See, e.g., McFadden v. United States, 945 A.2d 1203, 1207 (D.C. 2008) (holding defendant not in custody, despite officers having falsely told him "computer voice stress analyzer" test proved his guilt); State v. Wiernasz, 584 N.W.2d 1, 1 (Minn. 1998) (concluding interview not custodial where police falsely told defendant polygraph results established guilt with total certainty); United States v. LeBrun, 363 F.3d 715, 718, 724 (8th Cir. 2004) (deciding interview not custodial though officers falsely told defendant they had significant evidence establishing his guilt). Courts consider all the circumstances when making a custody determination. Muntean, 2010 VT 88, ¶ 19.

---

[4] The Mathiason Court stated in dicta that confrontation with false evidence had "nothing to do" with a custody determination under Miranda. 429 U.S. at 495-96. This assertion is "often not followed by lower courts" because it may be reasonable, in some cases, to assume that police would not release a suspect if indeed there were strong evidence that the suspect committed a serious crime. 2 W. LaFave et. al., Criminal Procedure § 6.6(d), at 816 n.56 (4th ed. 2015) (collecting cases); Muntean, 2010 VT 88, ¶ 28. But simply because confrontation with false evidence is relevant to a custody analysis does not mean that it is determinative. It is not. See Muntean, 2010 VT 88, ¶ 19 (explaining that there is no determinative factor to a custody analysis under Miranda).

¶ 21. Here the only other fact supporting a conclusion that defendant was in custody is that Detective Wilson was armed during the interview. But his weapon was holstered, and he never displayed it or used it to exert control over defendant, so this fact carries relatively little weight, unlike cases in which police threaten or restrain a suspect using weaponry. See New York v. Quarles, 467 U.S. 649, 655 (1984) (concluding defendant in custody after officers surrounded him with guns drawn).

¶ 22. In summary, Detective Whitney's statements that defendant could leave anytime, her calm, unaggressive tone and questions, defendant's voluntary arrival at the interview, its short duration, and the detectives' willingness to have a third-party witness present during questioning, combined with the comfortable setting of the interview room and the close proximity of an exit outside the interview room door—which was not locked—all suggest that a reasonable person in defendant's position would not have felt he or she was in custody. The totality of the circumstances support the trial court's conclusion: defendant was not in custody when he confessed.

### B. Defendant Confessed Voluntarily

¶ 23. An involuntary confession is inadmissible under the Due Process Clause of the Fourteenth Amendment. Pontbriand, 2005 VT 20, ¶ 22. Due process does not prohibit all police tactics or psychological pressure; rather, a defendant's statement is admissible as voluntary if it was "a product of the [defendant's] own balancing of competing considerations." State v. Bacon, 163 Vt. 279, 294, 658 A.2d 54, 64 (1995). The test is whether, based on the totality of circumstances, the suspect's will was overborne by police. Pontbriand, 2005 VT 20, ¶ 22. A confession is involuntary if law enforcement coercion "played a significant role in inducing [it]." Id. at ¶ 21.

¶ 24. The effects of police coercion and the characteristics of the defendant are both considered in a voluntariness analysis. State v. Reynolds, 2016 VT 43, ¶ 13, 201 Vt. 574, 145 A.3d 1256 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). Not all psychological

coercion exerted by police is prohibited, especially where a promise is ambiguous or nonspecific. See Arizona v. Fulminante, 499 U.S. 279, 285 (1991) (rejecting language in Bram v. United States that a confession could not be obtained by "direct or implied promises." 168 U.S. 532, 542-43 (1897)). For example, a police officer's use of psychological coercion involving promises of leniency and misrepresentations of authority can render a confession involuntary. Reynolds, 2016 VT 43, ¶ 15. But lies about incriminating evidence, taken alone, are not enough to make any resulting confession involuntary. Frazier v. Cupp, 394 U.S. 731, 739 (1969) (holding that officer's lie—that co-defendant confessed—did not render defendant's confession involuntary without other coercive factors, such as a promise of leniency). This Court reviews the facts established at the trial court regarding voluntariness for plain error, but we review the trial court's legal conclusion that defendant's confession was voluntary de novo. Reynolds, 2016 VT 43, ¶ 14.

¶ 25. Here defendant confessed in response to Detective Whitney's claim that there was DNA evidence to prove his guilt. The detective's false claim is not enough to render his confession involuntary without other coercive actions, such as a promise of leniency. Cupp, 394 U.S. at 739. But the detectives here made defendant no promises of leniency. And, as courts have reasoned, an interviewer's use of false evidence is less likely to produce an involuntary confession than an interviewer's lie about matters external to the charge. For example, lies threatening a suspect's ability to retain custody of a child render a confession involuntary because they could induce a confession by overcoming a suspect's will. Lynumn v. Illinois, 372 U.S. 528, 534 (1963). But lies about evidence of the charge are more likely evoke, if any feelings at all, a suspect's beliefs about his or her own culpability. Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir. 1992).

¶ 26. Defendant argues that his confession was involuntary because he believed the detectives wanted to talk about his job when he went to the interview, and he was surprised by A.H.'s allegations of sexual assault. There is no requirement that police inform a suspect of the allegations before beginning an interview; to the contrary, if police can lie about the existence of

evidence during the interview, Cupp, 394 U.S. at 739, then, absent other strong indicia of police coercion, they certainly can refrain from disclosing the allegations prior to an interview. Cf., State v. Harris, 105 P.3d 1258, 1265-66 (Kan. 2005) (holding that State need not disclose exculpatory evidence before interrogating an uncharged suspect).

¶ 27. Defendant also argues that police coerced him into confessing by promising that if he did then his niece would not have to testify. Threats to arrest a suspect's family member can render a confession involuntary. See Rogers v. Richmond, 365 U.S. 534 (1961). But there is no legal authority to support defendant's contention that his confession was involuntary because police suggested that the complainant—who happened to be his niece—would have to testify unless he confessed to having assaulted her. And this was not a promise by the detectives but a prediction of the State's strategy if the allegations progressed into a trial. See State v. Roberts, 160 Vt. 385, 389, 631 A.2d 835, 838 (1993) (reasoning that officer who told suspect that his cooperation could result in reduced bail was making prediction about value of cooperation and did not render resulting confession involuntary); State v. Beckley, 157 Vt. 446, 449, 600 A.2d 294, 296 (1991) (holding that officers' offer to convey to state's attorney that suspect cooperated did not render subsequent confession involuntary).

¶ 28. Last, defendant argues that his expert psychologist, Charles Rossi, would have testified that "in [the] moment [that defendant confessed]," he "fell apart," and the police "seized" on his psychological "weakness" by telling him he could protect A.H. by confessing. Defendant did not initially argue that his psychological functioning contributed to his confession in his motion to suppress, filed in February 2016. Nor did he do so in his supplemental memorandum from May 2016, or his January 2017 motion to reconsider. On the morning of the jury draw, when counsel finally raised defendant's psychological state as part of his argument that his confession was involuntary, he cited to evidence that the court had already excluded under Rule 702. The trial court accordingly denied defendant's motion to reconsider its ruling that defendant's confession

12

was voluntary. The court did not err by not reconsidering its ruling on the basis of inadmissible evidence.

¶ 29. For the above reasons, we affirm the trial court's order denying defendant's motion to suppress his confession.

## II. The Court Did Not Abuse Its Discretion By Excluding Two Defense Experts

¶ 30. Defendant argues he did not receive a fair trial because the trial court excluded his proposed expert witnesses, who would have testified to "what was happening in [his] mind when he confessed . . . ."

¶ 31. Defendant notified the prosecution that he had two clinical psychologists, Charles Rossi and Paula Nath, whom he intended to call as experts regarding his confession. The State moved to exclude them under Vermont Rule of Evidence 702. The court held a hearing at which only Nath testified. The court excluded Nath's testimony under Rule 702. After hearing counsel's proffer regarding Rossi's testimony, the court also excluded his testimony for the same reason. Defendant sought reconsideration of this ruling, filing a written memorandum and presenting oral argument. The court denied the motion to reconsider.

¶ 32. A witness may testify as an expert where "specialized knowledge" would "assist the trier of fact to understand the evidence or to determine a fact in issue." V.R.E. 702. The witness must qualify as an expert in the field at issue based on "knowledge, skill, experience, training, or education." Id. The expert may testify to specialized knowledge "in the form of an opinion" if three circumstances are shown. First, "the testimony is based upon sufficient facts or data," second, it is "the product of reliable principles and methods," and third, "the witness has applied the principles and methods reliably to the facts of the case." Id. Vermont's rule is based on Federal Rule of Evidence 702 and this Court has adopted the framework used in federal courts for reviewing challenges to expert testimony. Reporter's Notes—2004 Amendment, V.R.E. 702; State v. Brooks, 162 Vt. 26, 30, 643 A.2d 226, 229 (1993). When applying Rule 702, "trial judges

13

in Vermont must . . . act as gatekeepers who screen expert testimony ensuring that it is reliable and helpful to the issue at hand before the jury hears it." 985 Assocs., Ltd. v. Daewoo Elecs. Am., Inc., 2008 VT 14, ¶ 6, 183 Vt. 208, 945 A.2d 381 (quotation omitted). We defer to a trial court's decision on the admissibility of expert testimony, reviewing it for an abuse of discretion. Id. ¶ 9.

¶ 33. Paula Nath has a master's degree in school psychology and has been licensed as a clinical psychologist in Vermont for several decades. She met with defendant once, for one hour about one week after he confessed. At that time, he was in a "state of panic." She used the psychological method of debriefing to treat defendant that day. She explained that the goal of debriefing is to help the subject process their trauma and stabilize. Defendant reported to Nath that during his interview with Detective Whitney he felt guilty about two noncriminal events involving his niece: supposedly breaking her trust by sharing secrets she had told him with the detectives and purportedly failing to stop her from engaging in acts involving defendant that he believed were inappropriate, though not illegal. Nath concluded that defendant "translated" his guilt about these supposed events into guilt about the allegations made by the police. To support this assertion, she explained that there is a phenomenon in which people who feel guilt or shame conflate those feelings with a need to confess. Counsel proffered four expert conclusions to be presented at trial by Nath: (1) defendant confessed falsely; (2) he was in a crisis when he met with Nath; (3) he realized in Nath's presence that he had falsely confessed; and (4) he falsely confessed out of guilt over noncriminal events.

¶ 34. The trial court properly excluded Nath's testimony under Rule 702. Three of Nath's proposed conclusions involved her opinion that defendant confessed falsely. But she admitted to having no experience with false confessions, so she would not be able to, nor did she, "explain how [her] experience le[d] to the conclusion reached, why that experience is a sufficient basis for the opinion, [or] how that experience is reliably applied to the facts." F.R.E. 702 Advisory Committee Notes, 2000 Amendment. And, contrary to V.R.E. 702, she did not testify to a

14

methodology for concluding that someone confessed falsely. Because she lacked experience with false confessions and she did not explain how debriefing—the methodology that she used with defendant—led her to conclude that defendant testified falsely, her proffered conclusions that involve the veracity of his confession were properly excluded. Her remaining conclusion was that defendant was in crisis when she met with him. This occurred after he was released from pretrial detention. Defendant's post-detention mental state is irrelevant to the charged conduct here. See V.R.E. 401, 402 (stating relevant evidence is that which makes a fact at issue more or less likely). The trial court therefore did not abuse its discretion in excluding Nath's testimony.

¶ 35. Defendant's second proposed expert, Charles Rossi, testified at his deposition that he has a master's degree in counseling psychology. He did not have any "particular skills" dealing with false confessions and defendant was the "first person [he had] ever encountered" who, to his knowledge, has falsely confessed. He treated defendant with psychoanalysis. Rossi concluded that during the police interview defendant began to "decompensate" when Detective Whitney told him that there was DNA evidence that he had assaulted A.H. Soon after, officers told him he could help A.H., at which point "a lot" happened. Rossi conducted regular therapy sessions with defendant over the course of two years before his deposition. Rossi's understanding of what happened during defendant's confession had changed in the month before his deposition and it "probably would be different" in six months. Nevertheless, Rossi strongly believed that defendant confessed falsely for four reasons. First, defendant took a prescription drug the morning of the interview, which lowered his inhibitions. Second, defendant described wanting to save A.H. and his wife and thought he could do so by sacrificing himself. Third, defendant felt guilty, believing he should have intervened in matters involving A.H. about which only he knew. Last, defendant felt guilty about his own sexuality. Rossi also concluded that defendant has a "submissive" personality and wants to please whoever he is with, including the detectives that interviewed him.

15

¶ 36.    Rossi did not attend the hearing on the State's motion to exclude him from testifying at trial.  Instead, defense counsel referred the court to a transcript of Rossi's deposition and proffered three conclusions by Rossi to be presented at trial: (1) defendant falsely confessed because of a transference of his feelings of guilt regarding issues with A.H. other than her allegations against him; (2) defendant would not have falsely confessed to allegations involving another person or to a crime involving nonsexual conduct, such as a bank robbery; but he falsely confessed here because of a similarity between A.H.'s allegations and his feelings of guilt about purportedly failing to prevent A.H. from sitting on his lap in a fashion that defendant believed to be inappropriate; and (3) defendant falsely confessed to sacrifice himself and keep the rest of his family together.

¶ 37.    As with Nath, Rossi's testimony did not identify a methodology or prior experience that he used to determine whether defendant confessed falsely.  See V.R.E. 702; F.R.E. 702 Advisory Committee Notes, 2000 Amendment.  He described his methods for conducting psychoanalysis and for diagnosing defendant.  But he did not explain how those methods can be used to assess whether a patient has confessed falsely.  Defense counsel's proffered conclusions for Rossi all involved the assumption that defendant falsely confessed.  Because defendant did not demonstrate that this foundational opinion was based on reliable principles or methods, or prior experience, the court did not abuse its discretion in excluding Rossi's testimony.

¶ 38.    Defendant argues that he should have been allowed to present expert testimony on his "mental disorder" and "the likelihood that a person with a similar condition would report unreliable information."  He also claims that experts are needed to "undo" common myths about confessions.  We agree that expert testimony on false confessions, proffered in accordance with V.R.E. 702, is potentially relevant and admissible in Vermont.  Here, however, defendant did not indicate that either of his proposed experts would testify regarding the probability that a person with a psychological diagnosis similar to defendant's would confess falsely.  Nor did he explain

16

that this case involved a common myth about confessions that needed to be debunked by his experts. Nor did he proffer testimony on the incidence of false confessions or the factors associated with false confessions. A court cannot rule upon the admissibility of an expert conclusion that it was never provided.[5] Nor can it abuse its discretion by excluding experts who do not purport to offer any such conclusions.

### III. The Jury Instruction on Voluntariness Was Not Erroneous

¶ 39.    Defendant appeals the trial court's jury instruction regarding the voluntariness of his confession. To overturn a conviction based on an improper jury instruction, a defendant must show that the instruction "was both erroneous and prejudicial." Mobbs v. Cent. Vt. Ry., 155 Vt. 210, 218, 583 A.2d 566, 571 (1990). In assessing an error, we read the whole instruction and uphold those that "breathe[] the true spirit and doctrine of the law and do[] not mislead the jury." State v. Pitts, 174 Vt. 21, 23, 800 A.2d 481, 483 (2002) (quotation omitted).

¶ 40.    Defendant takes issue with the following instruction:

> You alone must determine . . . whether to consider [the] alleged confession[]. Before you may consider any alleged confession, you must find that the State has proven beyond a reasonable doubt that the confession was voluntary; in other words, that it was the product of a free and deliberate choice rather than coercion or improper inducement.
>
> While it is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect, the critical inquiry is whether the interrogation was so coercive as to undermine the suspect's ability to voluntarily waive his rights.

---

[5]  Defendant also contends that the trial court mischaracterized his expert-witness proffer. He explains that counsel told the court "repeatedly" that neither of his experts would testify as "human lie detectors." These assurances, however, were belied by the conclusions that counsel proffered, which, with one exception discussed above, involved as an assumption or sub-part, the conclusion that defendant confessed falsely. Defendant argues further that the trial court abused its discretion by failing to explain why his proposed expert testimony was inadmissible. We disagree. The trial court stated that defendant's proposed expert testimony did not satisfy any of the conditions of Rule 702. This explanation was sufficient for us to review the court's ruling.

¶ 41. Defendant argues that this instruction incorrectly removed the jury's focus from the voluntariness of defendant's confession and instead placed it on defendant's waiver of rights. We disagree. The court correctly instructed the jury on the definition of a voluntary confession. It also correctly explained the burdens of persuasion and production as to voluntariness. And the first clause of the third sentence is an accurate statement of the law as applied to the facts of this case, where defendant claims that psychological tactics rendered his confession involuntary. State v. Prue, 2016 VT 98, ¶ 39, 203 Vt. 123, 153 A.3d 551; State v. Bacon, 163 Vt. 279, 293, 658 A.2d 54, 64 (1995). The instruction accurately conveyed the spirit of the law. Pitts, 174 Vt. at 23, 800 A.2d at 483. We therefore will not disturb the jury's verdict.

Affirmed.

FOR THE COURT:

Associate Justice

18